In re MANUEL A. SEGARRA.

*Número:* O-72-306 *Resuelto:* 4 de octubre de 1974

*J. F. Rodríguez Rivera, y Peter Ortiz, Procuradores Generales Interinos, y Ruth Tentori de Lebrón-Velázquez, Federico Rodríguez Gelpí, Procuradores Generales Auxiliares,* abogados de El Pueblo; *Manuel A. Segarra,* por su propio derecho y *Héctor Segarra Irizarry,* abogado del querellado.*

PER CURIAM: Contra el Lcdo. Manuel A. Segarra, admitido a la práctica de la abogacía por este Tribunal el 10 de noviembre de 1966, el Procurador General formuló una querella, con fecha 16 de octubre de 1972, alegando conducta inmoral e impropia, contraria a lo dispuesto por los cánones de Ética Profesional.

Los cargos imputádosle son los siguientes:

"1. El querellado licenciado Manuel A. Segarra, allá en o alrededor del mes de marzo de 1969, incurrió en conducta inmoral e impropia de un abogado cuando vigentes las relaciones de abogado y cliente entre él y la querellante, Nélida Ramos Torres, se obligó e hizo creer a ésta que había pagado la deuda contraída

por ella en concepto de gastos de los funerales de su esposo por la suma aproximada de $2,000 a $4,000, la cual obtuvo del cobro de una póliza de seguro por accidente y retuvo para esos fines y para el cobro de honorarios por sus servicios profesionales, cuando la realidad era que el susodicho abogado no había hecho efectivos dichos pagos, habiendo retenido indebidamente todo el dinero para sí.

2. El querellado, licenciado Manuel A. Segarra, allá en o para el 1 de mayo de 1969, observó conducta impropia, al expedir a sabiendas dos cheques personales, números 929 y 930 en las sumas de $668.00 y $150.00 a favor de David H. Curley Funeral Home y Raúl Rosario respectivamente para el pago de los gastos incurridos por la querellante en el funeral de su esposo, los cuales fueron rechazados por el Banco de San Juan, Sucursal de Bayamón, por falta de fondos que los respaldaran y sin que el querellado tomara acción alguna para remediar tal acción impropia.

3. Constantes las relaciones de abogado y cliente anteriormente señaladas el querellado, licenciado Manuel A. Segarra, observó conducta impropia de un abogado a negarse a mantener informada a su cliente, la querellante Nélida Ramos Torres, sobre asuntos importantes que surgieron en el desarrollo de su causa, no obstante las frecuentes visitas que ésta le hiciera con el propósito de que se le informara sobre el caso y ante los perjuicios que tales acciones del querellado le venían ocasionando a la querellante.

4. Constantes las relaciones de abogado y cliente anteriormente señaladas el querellado, licenciado Manuel A. Segarra, incurrió en conducta altamente impropia de un abogado al abandonar el caso de su cliente, la querellante, ausentándose permanentemente de esta jurisdicción, sin haberle informado a ella de su intención de así hacerlo."

El querellado contestó el 3 de abril de 1974,[1] a través

---

[1] A pesar de haberse radicado la Querella el 16 de octubre de 1972, debido a que el querellado reside fuera de esta jurisdicción no se le pudo notificar de la Querella hasta el 17 de abril de 1973. El 22 de mayo de 1973, radicó una Moción solicitando 30 días para contestar la Querella y al no hacerlo, le concedimos el 21 de septiembre de 1973, un término final de 30 días improrrogables para contestar.

de su representación profesional, negando los cargos y alegando:

"1. Se niega el primer cargo de la querella y se alega en contrario que la relación profesional entre el querellado y la querellante comenzó en abril de 1969 y mediante las gestiones profesionales del querellado para el mes de mayo de 1969 se obtuvo el pago de una póliza de seguro por la suma total de $8,000.00 y de cuya suma después de descontados los honorarios y otros gastos la querellante recibió la suma de seis mil cuarenta y cinco dólares ($6,045.00).

2. Se niega el segundo cargo y se alega en contrario que lo que ocurrió fue que dichos cheques fueron girados contra valores aún sin cobrar, entonces, (uncollected funds) que una vez cobrados por el Banco respondían de los cheques girados.

3. Se niega el tercer cargo y se alega en contrario que el querellado fue diligente en el manejo del caso de la querellante porque habiéndose contratado los servicios profesionales del querellado durante el mes de abril de 1969 para el mes de mayo del mismo año la querellante había obtenido frutos positivos de las gestiones del querellado y había recibido el pago de las sumas expresadas en el hecho primero. Otras reclamaciones fueron referidas al Abogado del Estado de Massachusetts, George W. Arvantis, jurisdicción donde surgió la causa de acción y antes del mes de junio de 1969 se había radicado el caso y subsiguientemente el querellado se comunicaba con la representación profesional de aquel Estado y conforme recibía información del caso se lo hacía saber a la querellante.

4. Se niega el cuarto cargo, por cuanto la reclamación pendiente estaba siendo atendida por el Abogado de Massachusetts, con quien el querellado mantenía correspondencia y quien según recibía comunicación relacionada con el caso se lo notificaba a la querellante, aún estando ausente de esta jurisdicción el querellado continuó haciendo gestiones con el Abogado de Massachusetts a favor de la querellante y en febrero de 1971 le notificó sobre el status de su caso según la información que se le había suministrado. El querellado fue relevado de su responsabilidad profesional con, digo, mediante notificación hecha por el Lcdo. Ramón A. Cestero, Hijo, quien le notificó con copia de un contrato de Servicios Profesionales y se le indicó que el poder anteriormente conferídole había sido revocado."

El 17 de enero de 1974, el tribunal nombró al Hon. Ramón Negrón Soto, Juez Superior, para que actuara como Comisionado Especial y formulara determinaciones de hecho, en la presente Querella. Dicho Comisionado radicó su Informe el 31 de mayo de 1974, habiéndose celebrado la vista de la Querella los días 3 y 4 de abril de 1974. El 4 de junio del año en curso, dictamos Resolución concediendo a las partes un término simultáneo de 20 días para presentar objeciones a la transcripción de evidencia o a las determinaciones de hecho. El Procurador General compareció solicitando la aprobación de los documentos y el querellado no compareció a presentar objeciones. Siendo así y estando sostenidas por la prueba documental y la transcripción de evidencia, aceptamos como correctas las Determinaciones de Hechos del Comisionado Especial.

"1. Para el 14 de febrero de 1969 la Sra. Nélida Ramos Torres estaba casada con el Sr. Joaquín Rosario. Ese día el señor Rosario murió en un accidente automovilístico en el Estado de Massachusetts de los Estados Unidos de América.

2. A los efectos de hacer las reclamaciones correspondientes la señora Ramos Torres fue donde el Lic. Arturo Sánchez, abogado de Manatí, quien le recomendó al Lic. Manuel A. Segarra, a quien de ahora en adelante lo llamaremos el querellado. El 7 de abril de 1969 la señora Ramos hizo un Contrato de Servicios con el querellado, donde se comprometió a pagarle un 10% por la gestión que él hiciera del cobro de pólizas de seguro, beneficios de unión y otros beneficios similares. Dispone el contrato que el querellado ". . . descontará de sus honorarios la mitad de los gastos de viaje . . . ." que dió a Estados Unidos (Boston, Lawrence y New York) en esas gestiones a fines de abril y principios de mayo de 1969, para cuyos gastos la señora Ramos le anticipó la suma de $400.00. (Exhibit 1 de ambas partes.) El querellado le dió un recibo a la señora Ramos acreditando el haber recibido el 12 de abril de 1969 la suma de $400. (Exhibit 2 del querellante.)

3. Mediante Escritura Núm. 24 otorgada el 7 de abril de 1969 ante el Lic. Luis Arturo Sánchez Rodríguez, la señora Ramos Torres confirió un poder al querellado. (Véase Exhibit Núm. 8.)

4. Conforme a lo acordado el querellado se trasladó a los Estados Unidos, donde el 1ro. de mayo de 1969 recibió dos cheques, por $4,000.00 cada uno, de la Connecticut General Life Insurance Company que cubrían todo el importe de la póliza de seguro por accidente que tenía el señor Rosario para la beneficiaria, Sra. Nélida Ramos Torres. (Exhibit A del querellado.)

5. A su regreso a Puerto Rico el querellado le dió a la señora Ramos uno de esos cheques, conteniendo la suma de $4,000.00, más un cheque personal suyo por $2,045.00, lo que totalizó $6,045.00. El querellado retuvo la suma de $1,955.00, la cual desglosó en $800.00 como pago a sus honorarios acordados en un diez por ciento (10%), $668.00 para el pago a Curley Funeral Home, y $487.00 para el Sr. Raúl Rosario. (Exhibit 4 del querellante que es el C del querellado.)

6. Fechado el 1ro. de mayo de 1969 el querellado expidió su cheque personal número 929 girado contra la cuenta número 5030–803 del Banco de San Juan, Sucursal de Bayamón, a favor de David Curley Funeral Home por $668.00, el cual no fue pagado el 16 de mayo siguiente por haber sido girado contra fondos no cobrados ("Drawn Against Uncollected Funds"). Ello fue notificado el 27 de junio de 1969. (Exhibit 12 del querellante.)

7. En igual forma, fechado el 1ro. de mayo de 1969 el querellado expidió su cheque número 930 de igual cuenta bancaria a la orden de Raúl Rosario por $150.00, el cual tuvo igual destino que el anterior. (Exhibit 13 del querellante.)

8. Respecto al dinero retenido por el querellado para el Sr. Raúl Rosario se presentó un recibo fechado el 1 de mayo de 1969 de donde surge que dicho señor Rosario recibió $487.00 del querellado, estando entre ellos una suma de $150.00. (Véase Exhibit U del querellado.) Ello también se desprende de una carta que le envió el querellado al Lic. George W. Arvanitis el 17 de marzo de 1971 donde dice que todo el dinero adeudado al señor Rosario había sido pagado. (Exhibit O del querellado.)

9. Contrario a lo anteriormente expuesto, surge de la prueba que la suma de dinero, que importa $668.00, perteneciente a David Curley Funeral Home no fue pagada por el querellado, quien la ha retenido para él indebidamente. El propio querellado señala en la carta que le envió al licenciado Arvanitis, el 17 de marzo de 1971, que la Sucesión del señor Rosario no debía pagar esa suma de dinero, por lo que le solicitaba que le preparara un

cheque a nombre de él y de dicha funeraria, para entonces endosarlo y enviárselo a ellos en pago de lo adeudado, con cargo a los honorarios que le tocaren. (Idem., párrafo tercero.) En la vista celebrada el querellado aceptó que no ha pagado ese dinero, explicando que ello se debía a que tuvo conocimiento cuando llegó a Puerto Rico. Concluimos, en contrario, que ya para el 17 de marzo de 1971 el querellado tenía conocimiento de la deuda contraída por él con motivo de lo sucedido al cheque. No obstante, y con posterioridad a ello, la representación del Procurador General le comunicó al querellado, en carta del 16 de agosto de 1971, dichos hechos. (Véase Exhibit 14 del querellante.) En igual forma, señalamos que la querella de epígrafe, presentada el 16 de octubre de 1972, también le dió conocimiento al querellado de lo allí imputado al momento de emplazarlo.

10. El querellado no descontó de sus honorarios recibidos del pago de la póliza de seguro de $8,000.00, que fue el 10%, o sea $800.00, la mitad de los gastos del viaje dado. De la prueba presentada, que en este aspecto resulta ser su propio testimonio, por lo menos surge que gastó más de $325.00. Tampoco se desprende de toda la prueba que el querellado le hiciera a la señora Ramos Torres un resumen de sus gastos ni una liquidación de la suma de $400.00, que le fue dada como anticipo."

▮ Del primer cargo quedó probado que el querellado no pagó y retuvo para sí los $668.00 pertenecientes a David Curley Funeral Home y $150.00 pertenecientes a Raúl Rosario; que no presentó a la Sra. Ramos Torres una liquidación de los $400.00 que ella le adelantó para gastos y que cogió su 10% por servicios profesionales, sin descontarle la parte que le correspondía a él pagar por los gastos incurridos. Por lo tanto, violó el querellado el Canon 23 del Código de Ética Profesional, según aprobado el 24 de diciembre de 1970.

También quedó probado el segundo cargo, ya que el querellado tuvo conocimiento de que los cheques a los que ya hicimos referencia fueran girados contra fondos no cobrados y no tomó acción alguna para remediar esto, con lo cual violó la confianza depositada en él por su cliente, que esperaba que a nombre de ella, él hiciera dichos pagos. (Canon 23.)

En cuanto al tercer y cuarto cargo, el Comisionado llegó a las siguientes determinaciones de hechos:

"1. Según dijimos en el primer cargo, la señora Ramos contrató los servicios del querellado mediante contrato firmado el 7 de abril de 1969. (Exhibit 1 ambas partes.)

2. Inmediatamente el querellado hizo las gestiones pertinentes para cobrar la póliza de seguros por accidente en los Estados Unidos.

3. A los efectos de gestionar el cobro de cualquier suma de dinero como consecuencia del accidente en los Estados Unidos, y conforme al poder que le había conferido la señora Ramos el 7 de abril de 1969, el querellado gestionó y contrató los servicios del Lcdo. George W. Arvanitis en Lawrence, Massachusetts, y del Lcdo. Desimone.

4. Para abril de 1969 el querellado tenía oficina establecida en el pueblo de Vega Baja. En diciembre de igual año se ausentó de Puerto Rico para establecer su oficina en Chicago.

5. Mientras estuvo en Puerto Rico la señora Ramos visitaba frecuentemente la oficina del querellado, yendo la mayoría de las veces acompañada de su cuñado, el Sr. Flor Saenz Carrión. Tales visitas las hacían los sábados sin cita previa, y en más de una tercera parte de las veces, pudieron hablar con el querellado, quien la mantuvo siempre informada del desarrollo de su caso en Massachusetts.

6. Al irse para Chicago el querellado dejó en su oficina al Sr. Rogelio Bradley para que le informara a sus clientes de su paradero y les entregara los expedientes de los casos, en adición que refiriera algunos de ellos a otro abogado. El querellado notificó al Colegio de Abogados su nueva dirección. El señor Bradley le informó a la señora Ramos que el querellado se había ausentado definitivamente para Chicago. El dueño del edificio donde estaba la oficina del querellado le dió la dirección del querellado en Chicago a la señora Ramos.

7. Entonces la señora Ramos le escribió al querellado a Chicago una carta en manuscrito, en la que omitió la fecha, preguntándole sobre el estado de su caso. (Exhibit 5 del querellante.) El 26 de noviembre de 1970 volvió la señora Ramos a escribirle al querellado otra carta con igual propósito. (Exhibit 3 del querellante). Por primera y única ocasión, el querellado le contestó a

la señora Ramos el 22 de febrero de 1971, informándole que dentro de los próximos 15 días le enviaría un cheque con la liquidación final del seguro pendiente del Estado de Massachusetts. (Exhibit 9 del querellante, que es el D del querellado.)

8. Al no recibir ninguna otra comunicación del querellado, la señora Ramos fue al Colegio de Abogados un jueves del mes de agosto de 1971 a pedir información sobre el Lcdo. Segarra, y a exponer su problema. Allí se entrevistó con el Lcdo. Ramón Antonio Cestero Moscoso, quien trabajaba en el Programa de Servicios Legales del Colegio para personas indigentes. Como consecuencia de ello la señora Ramos hizo un contrato de servicios profesionales con el Lcdo. Cestero. (Exhibit 6 del querellante, y F del querellado.) Mediante la Escritura número 8 del 9 de septiembre de 1971 fue revocado el poder que le había conferido la señora Ramos al querellado. (Exhibit 7 del querellante.) El Lcdo. Cestero siguió haciendo gratuitamente todas las gestiones profesionales del asunto aquí tratado de la Señora Ramos hasta que entregó su expediente a la Comisión de Etica del Colegio de Abogados a fines del año 1972, o a principios del 1973. De hecho, la reclamación de la señora Ramos no pudo ser resuelta por el Lcdo. Cestero, ni tampoco lo había sido a la fecha de la vista celebrada en esta querella.

9. El 14 de septiembre de 1971 el Lcdo. Cestero le envió una carta al querellado pidiéndole le informara sobre las gestiones realizadas, e incluyéndole copia de su autorización de representación profesional y de la revocación del poder, antes referida, la cual no fue contestada. (Exhibit G del querellado.) El 29 de agosto de 1972 el Lcdo. Segarra se comunicó con el Lcdo. Cestero. (Exhibit 10 del querellante y E del querellado.) En igual forma, se comunicó con él en cartas del 6 y 27 de noviembre de 1972 requiriéndole la contestación de la primera. (Exhibits R y S del querellado.) Estas cartas no le fueron contestadas por el Lcdo. Cestero.

10. Explicó el querellado que él no hizo ninguna otra gestión luego de la revocación del poder, por razón de que entendía que el abogado de la señora Ramos, de ahí en adelante, era el Lcdo. Cestero.

11. En resumen, concluímos que con posterioridad a la carta que le envió el querellado a la señora Ramos el 22 de febrero de 1971, éste no la mantuvo enterada de la tramitación del caso

de Massachusetts y de las gestiones encomendadas por él al Lcdo. Avanitis y al Lcdo. Desimone."

 Surge de la prueba que el querellado no notificó por escrito, ni personalmente de su partida a la señora Ramos. Concluimos que una vez el querellado se trasladó permanentemente a Estados Unidos, violó el Canon 19 al no mantener debidamente informada a su cliente. Si bien es cierto que tenía derecho el querellado a trasladarse fuera de Puerto Rico, tenía la obligación para con la Sra. Ramos, así como con sus demás clientes, de notificarles inmediatamente su traslado y asegurarse que los intereses de éstos no se vieran afectados. En el caso de la Sra. Ramos no podemos perder de vista el hecho de que ésta le había conferido un poder, razón por la cual debió ver que se revocara el mismo, o debió ponerse en comunicación con ella antes de irse y hacerle saber que una vez radicado en Estados Unidos, continuaría haciendo las gestiones a favor de ella, hasta concluir la misma. Todo ello con la anuencia de dicha cliente. Al no hacerlo violó también el Canon 18 que le impone como deber del abogado, defender los intereses de sus clientes, diligentemente.

En el *Preámbulo* del Código de Etica que regirá la conducta de los miembros de la profesión legal de Puerto Rico (*Práctica Forense Puertorriqueña*, Tomo I, Sup. Acum., 1972, pág. 168; 99 D.P.R. 1002 (1970)), en parte lee así:

"En Puerto Rico, donde el sistema democrático es fundamental para la vida de la comunidad y donde la fe en la justicia se considera factor determinante en la convivencia social, es de primordial importancia instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía.

La consecución de estos fines le impone a los miembros de la profesión jurídica, sobre quienes recae principalmente la misión de administrar la justicia y de interpretar y aplicar las leyes, el deber de desempeñar su alto ministerio con la mayor y más excelsa competencia, responsabilidad e integridad.

En particular, el logro de estos fines le exige al abogado:

(a) que entienda que el fin primordial de su función como jurista es el servicio a la sociedad, servicio que tiene que estar dirigido principalmente a lograr la existencia real de un orden jurídico íntegro y eficaz y que tiene que estar orientado esencialmente por los principios de vida democrática y de respeto a la inviolable dignidad del ser humano que rigen la convivencia social en el país;

(b) que tenga presente siempre que las gestiones de su profesión afectan de una manera sustancial los aspectos principales de la vida comunal;

(c) que reconozca que existe un imperioso interés social en que todo ciudadano que lo necesite tenga fácil acceso a los servicios legales de abogados cuya conducta sea siempre honrosa, diligente y educada;

(d) que esté consciente de la importancia de evitar aun la apariencia de conducta impropia;

(e) que tenga un compromiso solemne e inquebrantable, no sólo de conducir su propia persona de acuerdo con los anteriores principios y los que siguen, sino también de velar porque la conducta de sus compañeros de profesión se rija igualmente por dichas exigencias."

En dicho cuerpo legal y bajo el título "Deberes del Abogado para con sus clientes", se expone el *"Criterio General"* que informa dicho Código de Etica, del modo siguiente:

"Criterio General

La relación de abogado y cliente debe fundamentarse en la absoluta confianza. Sujeto a las exigencias que surgen de las obligaciones del abogado para con la sociedad, las leyes y los tribunales, todo miembro del foro legal le debe a sus clientes un trato profesional caracterizado por la mayor capacidad, la más devota lealtad y la más completa honradez. El abogado debe poner todo su empeño en llevar a cabo en esa forma su gestión profesional, y no debe dejar de cumplir con su deber por temor a perder el favor judicial o por miedo a perder la estimación popular."

El Canon 23, al referirse al manejo de los bienes del cliente, en su párrafo segundo, expone:

"La naturaleza fiduciaria de las relaciones entre abogado y cliente exige que éstas estén fundadas en la honradez absoluta. En particular, debe darse pronta cuenta del dinero u otros bienes del cliente que vengan a su posesión y no debe mezclarlos con sus propios bienes ni permitir que se mezclen."

El abogado debe tener siempre en cuenta, en el cumplimiento de sus deberes y obligaciones, el altísimo honor en que nuestra profesión ha sido tenida y la autoridad atribuida a ella. Recuérdese que los romanos sentían por el derecho una vocación casi religiosa. En los momentos más graves, cuando se necesita afrontar los peligros o las responsabilidades de una decisión suprema, acuden al abogado aun los que le atacan o critican. Son muchas las veces en que la palabra de un abogado en asambleas o consejos ha tenido el poder de reunir a su alrededor los consentimientos, de orientar sobre las metas que se persiguen, y de afirmarse como voz dominadora. Los abogados, deben siempre afanarse, a través de sus claras actuaciones y limpio proceder, por mantener en la sociedad el sitial de respeto que se han labrado a lo largo de los años.

■ Estando las conclusiones del comisionado especial ampliamente sostenidas por la evidencia de autos; habiendo quedado probados los cargos imputados y apareciendo que la conducta inmoral e impropia del querellado fue perjudicial a la querellante, *se le separa permanentemente del ejercicio de la profesión de abogado.*