## MARYLAND STATE BAR ASSOCIATION, INC. *v.* SUGARMAN

[Misc. Docket (Subtitle BV) No. 5, September Term, 1974.]

*Decided December 9, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, ELDRIDGE and O'DONNELL, JJ.

*H. Russell Smouse,* with whom was *Robert Sloan, III,* on the brief, for respondent.

*James T. Wharton* and *Robert L. Kay* for petitioner.

SMITH, J., delivered the opinion of the Court.

Once again we are faced with the unpleasant task of disciplining a member of the bar of this Court. It is possible that the misconduct of the attorney here might not have come to light had it not been for the ongoing probe of Maryland political corruption.

The facts are not in dispute. Two questions are before us, whether testimony compelled under a Federal immunity statute, 18 U.S.C. §§ 6002-6003, may form the evidentiary base for disciplinary action and whether disbarment is the appropriate disposition of this case. We shall answer both questions in the affirmative.

Richard L. Sugarman was admitted to the bar of this Court on November 26, 1968, after examination. He has maintained an office for the practice of law in Montgomery County.

On June 10, 1974, pursuant to an authorization of its Board of Governors on April 10, 1974, the Maryland State Bar Association, Inc., filed its petition in this Court praying disciplinary action against Sugarman. The petition, filed pursuant to the provisions of Maryland Rule BV3, alleged that Sugarman "ha[d] committed acts of professional misconduct, ha[d] engaged in conduct prejudicial to the administration of justice, ha[d] committed acts of fraud and

deceit, ha[d] acted contrary to Canons 1, 7 and 9 of the Code of Professional Responsibility and ha[d] violated Disciplinary Rules 1-102, 7-102, and 9-102 of the Code of Professional Responsibility," adopted by Rule 1230. The matter ultimately came on for hearing before a panel of three judges of the Sixth Judicial Circuit designated by us under the provisions of Rule BV3 b to hear the matter in the Circuit Court for Montgomery County.

A large part of the evidence against Sugarman came from his testimony this spring as a witness for the Government in the trial of *United States v. N. Dale Anderson,* Criminal No. 73-0527-Y, in the United States District Court for the District of Maryland. The United States Attorney filed a motion in that case for "an order pursuant to the provisions of Title 18, United States Code, Section 6001 et seq., compelling Richard Lewis Sugarman to give testimony or provide other information, which he refuses to give or provide on the basis of his privilege against self-incrimination," reciting that the application was "made with the approval of Henry E. Petersen, Assistant Attorney General in charge of the Criminal Division of the Department of Justice, pursuant to the authority vested in him by 18 U.S.C. 6003 and 28 C.F.R. 0.175." An order of that court was duly passed on February 14, 1974, requiring Sugarman to "give testimony or provide other information which he refuse[d] to give or provide on the basis of his privilege against self-incrimination as to all matters about which he [might] be interrogated at said trial."

The hearing panel in the Circuit Court for Montgomery County said that "[t]he evidence is overwhelming that [Sugarman], by his own admissions, did engage in improper and illegal transactions for a client, one Joel Kline; and did purchase and sell stock in his own name with the fraudulent purpose of assisting said client in avoiding income taxes." It also said that he "did receive moneys from said Kline for the purpose of disguising custody by exchange of checks, commingling the bank accounts by the 'laundering' of moneys received from his client with fraudulent and deceitful purpose" and "[t]he rendering and delivering of

financial statements for professional services to the client Kline, which services were not rendered, [was] particularly distressing and was clearly for the purpose of enabling Kline to use such statements as tax or business deductions." Disbarment was recommended.

The immunity statute to which reference has been made, 18 U.S.C. § 6002, provides in pertinent part:

"§ 6002.  Immunity generally

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States, . . .

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

The crux of the question here raised by Sugarman may be stated as whether a disciplinary action against an attorney involves a potential criminal or quasi-criminal sanction for the purpose of the privilege against self-incrimination provided by the Fifth Amendment to the Constitution of the United States.

Sugarman bases his hopes here upon *Kastigar v. United States*, 406 U. S. 441, 92 S. Ct. 1653, 32 L.Ed.2d 212 (1972), and *Spevack v. Klein*, 385 U. S. 511, 87 S. Ct. 625, 17 L.Ed.2d 574 (1967).

In *Kastigar* the Court held that the immunity granted by 18 U.S.C. § 6002 was coextensive with the Fifth Amendment

privilege against self-incrimination and, therefore, the statute was constitutional since the grant of immunity supplanted the privilege and protected a person to the same extent. In that case the petitioners were called to testify before a grand jury where they claimed their privilege against self-incrimination. They were granted immunity pursuant to the statute. They still refused to testify on the ground that the immunity was not coextensive with the privilege. They were held in contempt and ordered confined. Mr. Justice Powell for the Court held that the Fifth Amendment did not require "transactional immunity," but only "use and derivative use immunity" which was granted by the statute in question.

> "This is very substantial protection, commensurate with that resulting from invoking the privilege itself. The privilege assures that a citizen is not compelled to incriminate himself by his own testimony. It usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer. This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that *the compelled testimony can in no way lead to the infliction of criminal penalties.* The statute, like the Fifth Amendment, grants neither pardon nor amnesty." *Id.* at 461. (Emphasis added.)

The emphasized language relates to the provisions of § 6002 in that the statute prohibits the use of testimony given under grant of immunity in any subsequent "criminal case." A "criminal case" is one that may "lead to the infliction of criminal penalties." Accordingly, if disbarment is a criminal penalty, then a disciplinary proceeding is a criminal proceeding and, pursuant to § 6002, which supplanted the constitutional privilege, the testimony given under the grant of immunity could not be utilized. Thus, the issue in this case becomes whether disbarment is a criminal penalty which cannot be inflicted on the basis of compelled

testimony. The Supreme Court of the United States has not expressly answered the question. Nothing in *Spevack* or in *In re Ruffalo*, 390 U. S. 544, 88 S. Ct. 1222, 20 L.Ed.2d 117 (1968), bears precisely upon the point.

In *Spevack*, a New York lawyer had refused to honor a subpoena duces tecum served on him in that he refused to produce the demanded financial records and refused to testify at the judicial inquiry. His sole defense was that the production of those records and his testimony would tend to incriminate him. The Appellate Division of the New York Supreme Court ordered him disbarred, holding that the constitutional privilege against self-incrimination was not available to him under the holding of *Cohen v. Hurley*, 366 U. S. 117, 81 S. Ct. 954, 6 L.Ed.2d 156 (1961). The Court of Appeals of New York affirmed. Mr. Justice Douglas announced the judgment of the Court and delivered an opinion in which three other justices joined. He said:

> "We conclude that *Cohen v. Hurley* [, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961),] should be overruled, that the Self-Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it." *Id.* at 514.

> \* \* \*

> "The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as 'the use of legal process to force from the lips of the accused individual the evidence necessary to convict him \* \* \*.' *United States v. White*, 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542." *Id.* at 516.

*Spevack* must be read in the light of the fact that Mr. Justice

Fortas, in concurring in the judgment and in the overruling of *Cohen v. Hurley*, said:

> "If this case presented the question whether a lawyer might be disbarred for refusal to keep or to produce, upon properly authorized and particularized demand, records which the lawyer was lawfully and properly required to keep by the State as a proper part of its functions in relation to him as licensor of his high calling, I should feel compelled to vote to affirm, although I would be prepared in an appropriate case to re-examine the scope of the principle announced in *Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948). I am not prepared to indicate doubt as to the essential validity of *Shapiro*." *Id.* at 520.

Four justices dissented in that case, making the Fortas vote essential to the holding.

The Supreme Court did not say in *Spevack* that a disciplinary proceeding was a criminal proceeding. The only reason that the privilege against self-incrimination was involved was because the attorney's testimony if given, so it was claimed, would have incriminated him in the conventional sense of that word, that is his testimony would have subjected him to possible prosecution under the New York penal code for solicitation and fee splitting. This view of *Spevack* is shared by R. Niles and J. Kaye, *Spevack v. Klein: Milestone or Millstone in Bar Discipline?* 53 A.B.A.J. 1121 (1967), and M. Franck, *The Myth of Spevack v. Kline*, 54 A.B.A.J. 970 (1968). They also discuss an immunity grant and the subsequent use of the testimony in a disciplinary proceeding. Both support the view we shall take here today.

*Ullman v. United States*, 350 U. S. 422, 76 S. Ct. 497, 100 L. Ed. 511 (1956), is relevant here. There the petitioner was convicted of contempt after refusing to testify before a grand jury. He had been granted immunity pursuant to the provisions of the Immunity Act of 1954, 68 Stat. 745, 18 U.S.C. (Supp. II) § 3486. However, he contended that his testimony might lead to loss of his job. Mr. Justice Frankfurter said for the Court:

"[T]he immunity granted need only remove those sanctions which generate the fear justifying invocation of the privilege: 'The interdiction of the 5th Amendment operates only where a witness is asked to incriminate himself, — in other words, to give testimony which may possibly expose him to a criminal charge. But if the criminality has already been taken away, the amendment ceases to apply.' *Hale v. Henkel,* 201 U.S. 43, 67, 26 S.Ct. 370, 376, 50 L.Ed. 652. Here, since the Immunity Act protects a witness who is compelled to answer to the extent of his constitutional immunity, he has of course, when a particular sanction is sought to be imposed against him, the right to claim that it is criminal in nature." *Id.* at 431.

His conviction was affirmed.

Pertinent to the inquiry here is *Matter of Rouss,* 221 N. Y. 81, 116 N. E. 782 (1917). Jacob Rouss had been compelled under a New York statute to give testimony against five New York City police inspectors who had been indicted for conspiracy to obstruct justice through the suppression of an individual's testimony. In the course of that trial it was established that Rouss had entered into an arrangement with a potential witness by which for a money consideration that person would keep without the state. Charges of professional misconduct were then preferred against Rouss. The statute provided that "no person [should] be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he [might] so testify or produce evidence, documentary or otherwise, and no testimony so given or produced [should] be received against him, upon any criminal investigation, proceeding or trial." As Judge Cardozo put it for the New York court, the question became "whether disbarment is a penalty or forfeiture within the meaning of that statute." In the process of holding that it was not, he said:

"Membership in the bar is a privilege burdened with conditions. A fair private and professional

character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards (*Selling v. Radford*, 243 U.S. 46; *Matter of Durant*, 80 Conn. 140, 147). Whenever the condition is broken, the privilege is lost. *To refuse admission to an unworthy applicant is not to punish him for past offenses.* The examination into character, like the examination into learning, is merely a test of fitness. *To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied.* For these reasons courts have repeatedly said that disbarment is not punishment (*Ex parte Wall*, 107 U.S. 265; *Matter of Randall*, 11 Allen, 473, 480; *Matter of Randel*, 158 N.Y. 216; *Boston Bar Assn. v. Casey*, 211 Mass. 187, 192; *Matter of Durant, supra*). 'The question is,' said Lord Mansfield, 'whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion' (*Ex parte Brounsall*, [2] Cowp. 829). 'It is not,' he continued, 'by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not.' This ruling was announced after consultation with all the judges, 'as it is for the dignity of the profession that a solemn opinion should be given.' On that high plane the jurisdiction was thus early placed, and in that high spirit it has been exercised. Even pardon will not elude it. Pardon blots out the offense, and all its penalties, forfeitures and sentences; but the power to disbar remains (*Matter of an Attorney*, 86 N.Y. 563). We do not need to inquire now whether the power is so essential and inherent that the legislature may not take it away (*State ex rel. Wood v. Raynolds*, 158 Pac. Rep. 413, and cases there cited). At least we will not hold it to

have been taken away by words of doubtful meaning. We will not declare, unless driven to it by sheer necessity, that a confessed criminal has been intrenched by the very confession of his guilt beyond the power of removal." *Id.* at 84-85. (Emphasis added.)

Contentions similar to that raised by Sugarman were considered and rejected in *In re Klebanoff*, 21 N.Y.2d 920, 237 N.E.2d 75, 289 N.Y.S.2d 755, *cert. denied*, 393 U. S. 840 (1968), and in *In re Schwarz*, 51 Ill. 2d 334, 282 N.E.2d 689, *cert. denied*, 409 U. S. 1047 (1972). In the latter case the court summarily disposed of the issue by stating:

"It is argued, however, that unless article 106 is read to include immunity from professional discipline, the respondent's rights under the fifth amendment to the constitution of the United States will be violated. In support of this contention, respondent relies heavily upon *Spevack v. Klein (1967), 385 U.S. 511, 17 L.Ed.2d 574, 87 S.Ct. 625.* He contends that the holding of that case serves in a general way to make 'the privilege against self-incrimination applicable to a disbarment proceeding.' In our view this interpretation is much too broad. 'Answers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying.' *(Gardner v. Broderick (1968), 392 U.S. 273, 276, 20 L.Ed.2d 1082, 1085, 88 S.Ct. 1913.)* The respondent has not been prosecuted criminally by reason of his testimony, and his fifth amendment rights have not been violated.

"The report and recommendation of the commissioners is approved and the respondent is disbarred." *Id.* at 337-38.

This Court has said specifically that disciplinary proceedings for professional misconduct are not criminal proceedings. *Balliet v. Balto. Co. Bar Ass'n*, 259 Md. 474, 478,

270 A. 2d 465 (1970), and *Braverman v. Bar Assn. of Balto.*, 209 Md. 328, 336, 121 A. 2d 473, *cert. denied*, 352 U. S. 830 (1956).

The Lord Mansfield Rule quoted by Judge Cardozo in *Rouss* was quoted by Judge Markell for this Court in *In re Meyerson*, 190 Md. 671, 675-76, 59 A. 2d 489 (1948), and, more recently, by Judge Digges for the Court in *Balliet*, 259 Md. at 478. In *Maryland State Bar Association, Inc. v. Frank*, 272 Md. 528, 325 A. 2d 718 (1974), we considered and rejected a contention that where an individual had been found not guilty under a criminal indictment disciplinary proceedings on the same charges could not be maintained against him because to do so would place him in jeopardy for the second time.

The traditional view of disbarment, as set forth by Lord Mansfield, has been that it is not intended as punishment to the individual, but as protection to the public from such individuals. The special relationship of the bar to the courts was pointed out in *In re Cannon*, 206 Wis. 374, 240 N. W. 441 (1932), where the court said:

> "The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attache of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute." *Id.* at 383.

The South Dakota court observed in *In re Petition of Morrison*, 45 S. D. 123, 186 N. W. 556 (1922), when faced with many endorsements of reinstatement:

> "Some twenty or more think petitioner has suffered sufficient *punishment* — apparently forgetting that disbarment is not imposed as a punishment, but as a necessary means of protection to society, and that, as long as society may need protection, this court has no right to deny such protection merely because an individual may suffer

from not being allowed to hold the power to injure society. Many urge that the *punishment* he has suffered will deter him from future wrongdoing, forgetting that it is not fear as to the consequences of wrongdoing that qualifies one for admission to the bar, but rather an innate desire and intent to follow the right course." *Id.* at 129-30. (Emphasis in original.)

In *Meyerson* Judge Markell cited for the Court *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094 (1938). That court observed:

"From time immemorial lawyers have in a peculiar sense been regarded as officers of the court. It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He owes a definite responsibility to the public in the proper administration of justice. It is of utmost importance that the honor and integrity of the legal profession should be preserved and that the lives of its members be without reproach. The malpractice of one reflects dishonor not only upon his brethren, but upon the courts themselves, and creates among the people a distrust of the courts and the bar." *Id.* at 598.

Judge Cardozo concluded his opinion for the Court in *Rouss* by stating:

"Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided. The claim of immunity from disbarment cannot survive the application of that test. If the exemption protects lawyers, it must equally protect physicians, whose licenses have long been subject to revocation for misconduct (Public Health Law, § 170; Consol. Laws, ch. 45; 1 R.S. 452, § 3; *Matter of Smith*, 10 Wend. 449; *Allinson v. Gen. Council of Medical Education* [L.R. 1894] 1 Q.B. 750). Two great and honorable

professions have in that view been denied the right to purify their membership and vindicate their honor. The charlatan and rogue may assume to heal the sick. The knave and criminal may pose as a minister of justice. Such things cannot have been intended, and will not be allowed.

"The order of disbarment should be affirmed." *Id.* at 91.

If Sugarman's contention were to prevail, then the decision as to whether an individual would continue to be a member of the bar of this Court might well pass from this Court to the prosecutor empowered to grant immunity, be he State or Federal, because by such a holding this Court could be powerless in the future to protect the public after a grant of immunity to an attorney, no matter how outrageous his conduct might be. For instance, a lawyer might be regarded by a prosecutor as the least important person in a conspiracy between him and others to murder the President of the United States, the Governor of this State, and the Chief Judge of this Court and at the same time to plunder the public treasury. A prosecutor might well think it necessary to grant that lawyer immunity in order to convict others of supposedly more importance. However, a holding such as that requested by Sugarman would leave us unable to prevent such a conspirator from practicing law unless we had before us *independently* obtained evidence. Even then, there would be a strong burden to show that it was in fact independently obtained. *See Kastigar v. United States, supra,* at 459-61.

Based upon the holdings in the New York and Illinois cases, our repeated statements that disbarment proceedings are not criminal proceedings, *Kastigar,* and the traditional view of Anglo-American jurisprudence that disbarment is intended not as punishment, but as protection to the public, we hold that this proceeding is not a "criminal case" within the purview of 18 U.S.C. § 6002 or the Fifth Amendment to the Constitution of the United States. Therefore, the testimony elicited from Sugarman under the provisions of

that act may indeed form an evidentiary basis for disciplinary action against him.

Sugarman urges that if we reject his contention relative to use of the testimony, "then it is submitted that an appropriate disposition would be a reprimand . . . or, at the very most, a short period of suspension." The panel of judges said in their recommendation:

> "Mr. Sugarman's counsel attempts to persuade us that only a reprimand or suspension is in order, for two reasons — 1) that he testified in the trial and ultimate conviction of Dale Anderson and was cooperative to that end, and 2) that he was naive and held Joel Kline in awe and was in fear of this man and of losing him as a client. Neither of these reasons is persuasive to the Panel. He testified only after given immunity from criminal prosecution, and to suggest that fear of loss of business is an excuse for avoiding professional responsibility taxes one's reasoning power. Anyone who uses such judgment is a threat to society in the practice of law.

> \* \* \*

> "We find no extenuating circumstances here, and also note that assisting in the willful evasion of income taxes is within the class of felonious crimes involving moral turpitude. Accordingly, to protect the public and to preserve the integrity of the legal and judicial system of Maryland, we recommend that the name of the Respondent, Richard L. Sugarman, be stricken from the rolls of those authorized to practice law in this State."

Since we agree with the reasoning and findings of the panel of judges, we reject the suggestion of Sugarman. His activities reflect his lack of the basic moral character essential to membership in the legal profession. Accordingly, for the protection of the public, the name of

Richard L. Sugarman will be stricken from the rolls of those authorized to practice law in this State.

*It is so ordered.*