IN THE MATTER OF THE PETITION FOR REIN-
STATEMENT TO THE BAR OF MARYLAND OF
THOMAS PAUL RAIMONDI

[Misc. Docket (Subtitle BV) No. 3, September Term, 1977.]

* * *

IN THE MATTER OF THE PETITION FOR REIN-
STATEMENT TO THE BAR OF MARYLAND OF
FRANCIS X. DIPPEL

[Misc. Docket (Subtitle BV) No. 15, September Term, 1977.]

*Decided July 25, 1979.*

The causes were argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

In Misc. (BV) No. 3, *James A. Frost, Assistant Bar Counsel,* for Attorney Grievance Commission of Maryland, and *Jerome A. Dashner* for Thomas Paul Raimondi.

In Misc. (BV) No. 15, *John Grason Turnbull, II,* for Francis X. Dippel, and *James A. Frost, Assistant Bar Counsel,* for Attorney Grievance Commission of Maryland.

SMITH, J., delivered the opinion of the Court.

We decline in these cases to reinstate Francis X. Dippel and Thomas Paul Raimondi as members of the Bar of this State. The cases are in no way connected. Because the same principles of law and policy are applicable in each case, we have consolidated these two matters for the purpose of an opinion.

Maryland Rule BV14 provides that an attorney's petition for reinstatement to the bar shall be filed in this Court. It must "set forth facts showing that the petitioner is rehabilitated and is otherwise entitled to the relief sought." If we reserve judgment until after hearing, as we did here, Bar Counsel is to "conduct an appropriate investigation and shall refer the petition to an Inquiry Panel selected by the Chairman of the Inquiry Committee." Thereafter the petition is to be heard and determined in accordance with Rule BV6 c concerning complaints and investigations and is to be reviewed by the Review Board in accordance with Rule BV7. Bar Counsel is then to transmit to us the recommendations of the Review Board and any evidence. Rule BV14 c 3 then provides that Rules BV9 e concerning charges and pleadings

and Rule BV11 b concerning disposition of charges in subsequent proceedings are applicable to proceedings under BV14. A person desiring reinstatement has the burden under Rule BV14 d 4 "to establish the averments of the petition by clear and convincing proof."

## I The law

The four principal factors to be considered in evaluating a petition for reinstatement to the bar were set forth by Chief Judge Murphy for the Court in *In re Braverman,* 271 Md. 196, 199-200, 316 A. 2d 246 (1974), and repeated by Judge Eldridge for the Court in *In re Barton,* 273 Md. 377, 379, 329 A. 2d 102 (1974). They are: (1) the nature and circumstances of the original misconduct; (2) petitioner's subsequent conduct and reformation; (3) his present character; and (4) his present qualifications and competence to practice law. Judge Eldridge noted in *Barton* that "the more serious the original misconduct was, the heavier is the burden to prove present fitness for readmission to the bar." *Id.* at 380.

This Court has said repeatedly that the purpose of disbarment is not to punish, but to protect the public. *See, e.g., Barton,* 273 Md. at 381; *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 318, 329 A. 2d 1 (1974), *cert. denied,* 420 U. S. 974 (1975); *Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 533, 325 A. 2d 718 (1974); *Maryland St. Bar Ass'n v. Callanan,* 271 Md. 554, 557, 318 A. 2d 809 (1974); *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 549, 318 A. 2d 811 (1974); *Bar Ass'n v. Marshall,* 269 Md. 510, 519, 307 A. 2d 677 (1973); *Balliet v. Baltimore Co. Bar Ass'n,* 259 Md. 474, 478, 270 A. 2d 465 (1970); and *In re Meyerson,* 190 Md. 671, 675, 59 A. 2d 489 (1948). Also, see the opinion by Judge Cardozo in *Matter of Rouss,* 221 N.Y. 81, 84-85, 116 N. E. 782 (1917), to the same effect.

In *Meyerson* Judge Markell said for the Court, "Whether an application for reinstatement is called an application to set aside a disbarment order or an application for admission to practice, its essential nature is the same." He then went on to quote from *In re Keenan,* 310 Mass. 166, 170, 37 N.E.2d

516 (1941), where the Supreme Judicial Court of Massachusetts said, "A subsequent petition for admission to the bar involves a new inquiry as to whether, in the interval following the rendering of the judgment of removal, the petitioner has become a proper person to hold such office." We again quoted that language in *Maryland St. Bar Ass'n v. Boone,* 255 Md. 420, 432, 258 A. 2d 438 (1969).

In *Meyerson* Judge Markell also said for the Court:

As disbarment is not punishment, likewise we think due regard for the administration of justice does not permit disbarment and reinstatement to be made mere adjuncts to reform schools and the parole system. The authorities that seem to us the best considered take a different view, which is consistent with the principles recognized in Maryland. [*Id.* 190 Md. at 678.]

We quoted that language with approval in *Boone,* 255 Md. 420, 433.

## II Dippel

Dippel was originally admitted to the Maryland Bar in November 1947. He practiced law until his disbarment in 1963.[1] During this period he served one year in the House of Delegates and one term in the Maryland Senate. The inquiry panel summarized the facts surrounding his disbarment:

[It] was precipitated by investigations and subsequent criminal indictments concerning a scheme devised by [Dippel] and an accomplice,

---

1. In his petition for reinstatement Dippel said that in 1963 while under indictment he "voluntarily tendered his resignation from the Maryland Bar." It is true that he tendered his resignation to the Supreme Bench of Baltimore City. It, however, refused to accept Dippel's resignation, possibly because it thought "resignation" carried a different connotation than "disbarment." A complaint was duly filed with it. It held a hearing after which it disbarred Dippel on September 13, 1963. Reference was made in the order of disbarment to the convictions mentioned in the panel's opinion here. (Disciplinary proceedings were handled in the circuit courts of the 23 counties of Maryland and in the Supreme Bench of Baltimore City prior to the revision of the BV rules in 1970.)

Henry Edward Wisowaty, who also was a member of the Maryland Bar, whereby they would file documents with the Orphans' Court of Baltimore City to gain control of estates of deceased resident aliens, then divest the estates of all capital assets to their own use, the assets being apportioned between them. The scheme included in some cases the preparation of forged Wills leaving substantial parts of the estate to fictitious heirs, the payment of fictitious claims, and the filing of spurious and false documents. As a result of these activities, six indictments were brought against [Dippel] for embezzlement, larceny and conspiracy, the total amounts embezzled for the six estates being $71,083.46. Eventually, total restitution was made of that sum, [Dippel] having made restitution in the amount of $45,083.46, and Wisowaty having made restitution in the amount of $26,000. In the meantime, however, as a result of those indictments, [Dippel] pleaded guilty to the six indictments charging embezzlement, and the State's Attorney stetted the companion charges of larceny and conspiracy. Judge Charles Harris in the Criminal Court of Baltimore City sentenced [Dippel] to terms totalling 15 years in the Maryland Penitentiary, which was later reduced to 5 years after partial restitution had been made, and after serving approximately 21 months of his sentence, [Dippel] was paroled after one previous parole application had been denied.

T. Hughlett Henry, Jr., Esq., of the inquiry panel, pressed Dippel as to the reason for his criminal activity. Dippel replied, "It wasn't a question of earning money because I was earning money — $40,000 to $50,000 a year from about 1950. I can't say and I will not blame it on my wife or anybody except stupidity on my own part." He was then asked whether he thought "it was just a clever operation," to which he replied, "Well, it appeared so easy."

Upon his release from prison Dippel secured employment

as an insurance consultant through the efforts of friends. Thereafter he became employed by the Social Security Administration on August 8, 1966. He is still employed there as a labor relations specialist. He was granted a full pardon on November 10, 1976.

The panel heard numerous witnesses. All of those produced by Dippel praised him, saying what a fine, outstanding gentleman he is today, and recommending his reinstatement. Two attorneys were produced by Bar Counsel in opposition to the reinstatement. Both had been actively involved in the extensive investigation into Dippel's wrongdoings, one as a member of the Grievance Committee of the Bar Association of Baltimore City and the other as a representative of true heirs of one of the estates involved. Each subsequently served as president of the Maryland State Bar Association. Each of these attorneys strongly opposed reinstatement.

The panel recognized the criteria for consideration of a petition for reinstatement set forth in *Barton, Boone,* and *Braverman.* It addressed itself to each of those criteria. It said relative to the cause of his disbarment:

> The misconduct of [Dippel] which led to the various investigations, both civil and criminal, resulting in indictments and court proceedings, disbarment, conviction, and sentencing, was of the most severe nature that an attorney can be guilty and was not a single, isolated aberration or youthful prank, but a deliberate plan to scheme and defraud innocent people out of funds belonging to them.

It concluded that his conduct "subsequent to his release from prison has been exemplary and he has made genuine efforts to reform himself in his life style, the community, and job." It found "no indication that [Dippel's] present character has been blemished to any extent which would in itself prohibit his reinstatement." Concerning his present qualifications and competence to practice law, it observed in pertinent part:

> [Dippel] has been away from the active practice of law since at least June of 1963, a period of over 15

years, and his efforts to keep current with Maryland law have been very limited.

* * *

With respect to his competence to practice law, there is, of course, always some question in the case of a lawyer who has been unable to practice for 15 years. The criteria set, however, in grave crimes require a substantial period for rehabilitation and reformation and it is unlikely, in a case of such gravity of misconduct leading to disbarment as this, that a shorter time than 15 years would ever be acceptable. Hence, to consider competence, we must measure this applicant against others forbidden to practice for such a period.

Dippel has proven his competence in a specialized field of law — labor relations, and has participated as an advocate in many matters where a licensed lawyer was not required. He admits he has made only casual efforts to keep abreast of the changes in Maryland case and statute law. He asserts that he would know when he was incompetent and would associate with him a competent lawyer when the occasion arose. If this competence criterion were the only one standing in the way of reinstatement, it would point up the need for a rule permitting conditional reinstatement at the end of a period of refresher legal education.

The primary consideration deals with the gravity of the original misconduct and the extent that Petitioner has shown his reformation and the improbability of a repetition of such conduct if reinstated. The burden of proof is Petitioner's and the graver the misconduct the greater the burden.

The crimes that he committed are peculiarly available to unscrupulous lawyers and the fraudulent devices used — false wills, false claims pursued in Court, and false affidavits to support them — fall within the areas of the legal training he

received at the outset. It is possible, but not probable, that these fraudulent schemes could have been carried out by one who was not a member of the Bar.

A lawyer who uses his legal skills to defraud has been put in the position to victimize the public through the sanction of the bar in its prior approval of his integrity and morality.

[Dippel] committed crimes not only against the dignity of the State, but also against his profession and the Courts of which he was an officer. It is difficult enough to envision reinstatement of a lawyer who embezzles funds entrusted to him without the mitigating circumstances of an irresistible motive. Petitioner did not commit one embezzlement under the pressure of dire need or duress. He committed a series of carefully schemed embezzlements because, in his words, he was "stupid — it appeared so easy." He was apparently an able lawyer at the time of the original misconduct and some of his schemes were ingenious, so the explanation of stupidity is unacceptable. That the money was easy to take seems the most reasonable explanation of his fraudulent acts. He should not have the sanction of the bar to invite the public to entrust to him more funds that are easy to take. The Panel has not been persuaded that [Dippel] has met the heavy burden of proof entitling him to reinstatement.

Pursuant to Rule BV14 d 2 the Review Board, for which provision is made in Rule BV7, reviewed the matter. It unanimously "concurr[ed] in and adopt[ed] the Inquiry Panel's recommendation that [Dippel's] Petition for Reinstatement should be denied . . . ."

## III Raimondi

Thomas Paul Raimondi was admitted to practice before this Court on October 15, 1953. We accepted his resignation with

prejudice on December 29, 1972. (We now refer to such proceedings as disbarment by consent. Rule BV12 d.) Raimondi was convicted in the Criminal Court of Baltimore of attempting to bribe a member of the General Assembly. This was all an outgrowth of the election of Governor Spiro T. Agnew as Vice-President of the United States and the fact that the General Assembly became obliged to elect a Governor of Maryland. The details of his wrongdoing are set forth in *Raimondi v. State,* 12 Md. App. 322, 278 A. 2d 664 (1971), and *Raimondi v. State,* 265 Md. 229, 288 A. 2d 882, *cert. denied,* 409 U. S. 948 (1972). He was granted a full pardon on May 27, 1975.

Raimondi was employed in several different places from the time of his release from prison in 1973 until the time that he passed a competitive examination and was selected as a hearing officer in the Insurance Division of the State of Maryland, a part of the Department of Licensing and Regulation.

As in Dippel's case, Raimondi was able to produce a number of individuals who praised him highly and said what a fine gentleman he is now.

The Raimondi panel also recognized the criteria for consideration of a petition for reinstatement set forth in *Barton, Boone,* and *Braverman.* It seemed a bit inclined to regard the original misconduct as not grave in nature. It referred to the fact that the then State's Attorney "stated that although his office viewed the crime as serious in terms of its impact on the governmental structure, 'We did not think that there was too great an imminent danger of its coming to fruition because it was just a little bit too bizarre to be — it was a long, long shot even from the point of view of those attempting to perpetrate it.'" It said that "[i]n the final analysis, however, based upon the record before it and its observation of [Raimondi] during his testimony, the Panel agree[d] with the remarks of [one witness] who ha[d] known [Raimondi] both socially and professionally for approximately 27 years, that what [Raimondi] did was 'stupid', 'irrational' and 'out of character.'" It observed that although the crime "was a serious act, it appear[ed] to have been perpetrated for

purposes of embarrassing [one individual] rather [than] for any apparent personal gain." The panel "conclude[d] that insofar as the nature and circumstances of [Raimondi's] misconduct are concerned, his reinstatement would not be prejudicial to the interests of the public or the administration of justice."

The panel went on to consider the other criteria. It referred to Raimondi's substantial involvement in civic and fraternal affairs. It "f[ound] that [Raimondi] has met the burden of establishing that his conduct and reformation since his release from prison warrant his reinstatement to the practice of law." It likewise found that he "has met the burden of establishing that his present character merits favorable consideration for his readmission to the Bar." Concerning his present qualifications and competency to practice law, the panel concluded by saying:

> In the instant case approximately 4½ years elapsed between the acceptance by the Court of Appeals of [Raimondi's] resignation from the Bar and the filing of his Petition for Reinstatement, and a further 1½ years has elapsed since then. During that period, [he] obtained a Master's degree in Public Administration and has served for 2½ years as a Hearing Officer in the Insurance Division for the State of Maryland. According to the testimony of Insurance Commissioner Birrane, his executive assistant, Ted Hickman, and several attorneys who have tried numerous cases before him, he has performed his duties with extreme competence. We believe that [Raimondi's] accomplishments, as well as his own testimony, evidence a sound and responsible attitude toward refreshing his professional skills. We are satisfied that if readmitted to the practice of law, [he] would abide by the requirements of EC 6-1.

The inquiry panel recommended Raimondi's reinstatement.

The matter was reviewed by the Review Board pursuant to Rule BV14 d 2. It "concurr[ed] in and adopt[ed] the Inquiry

Panel's recommendation that [Raimondi's] Petition for reinstatement should be granted . . . ."

## IV Dispositions

Where there has been a disbarment for crimes such as were committed by Dippel and Raimondi we regard the nature of the crimes and the circumstances surrounding them as one of the most important of the criteria to be considered on an application for reinstatement. Therefore, we focus in these two cases on the nature and circumstances of the original conduct. In so doing we note that in considering such an application we must remember that, as it was put in *In re Cannon,* 206 Wis. 374, 240 N. W. 441 (1932):

> The relation of the bar to the courts is a peculiar and intimate relationship. The bar is an attaché of the courts. The quality of justice dispensed by the courts depends in no small degree upon the integrity of its bar. An unfaithful bar may easily bring scandal and reproach to the administration of justice and bring the courts themselves into disrepute. [*Id.* at 383.]

We note relative to reinstatement the comment in *In re Morrison,* 45 S.D. 123, 186 N. W. 556 (1922):

> [A court] should endeavor to make certain that it does not again put into the hands of an unworthy petitioner that almost unlimited opportunity to inflict wrongs upon society possessed by a practicing lawyer. [*Id.* at 126.]

There may be a point in time when it is proper to reinstate to the practice of law even one who has committed a most heinous crime. We are unable to draw a precise line as to when that might be. We point out once again Judge Eldridge's observation for the Court in *Barton,* 273 Md. at 380, "[T]he more serious the original misconduct was, the heavier is the burden to prove present fitness for readmission to the bar."

It may not have been so labeled, but what courts do when

faced with any application for reinstatement from a previously disbarred lawyer is to engage in a balancing process. On one side of the scale is placed the seriousness of the misconduct which produced disbarment and the court's duty to society at large to see that only those persons who are worthy of the faith and confidence of the general public are permitted to handle the affairs of others. In this regard, it must be remembered as Chief Justice Vinson said in *In Re Isserman,* 345 U. S. 286, 289, 73 S. Ct. 676, 97 L. Ed. 1013 (1953), *reversed on other grounds,* 348 U. S. 1, 75 S. Ct. 6, 99 L. Ed. 3 (1954), "There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice." On the other side are placed the subsequent conduct and reformation of such individual, his present character, his present qualifications and competence to practice law, and the fact that the very nature of law practice places an attorney in a position where an unprincipled individual may do tremendous harm to his client. In this balancing process consideration must be given to the length of time which has elapsed since disbarment. Also, it must not be forgotten that a disbarred attorney was previously found to possess good moral character. Otherwise, he would not have been admitted to practice law. Thus, either someone erred in the earlier evaluation of his character or the weakness of character producing the earlier misconduct previously failed to manifest itself. For this reason such an applicant must undergo an even more exacting scrutiny than he did earlier. In evaluating the statements from others as to the present good moral character of an applicant for readmission it must not be forgotten that a disbarred lawyer — like many people convicted of so-called "white-collar" crime — had earlier occupied a position in society where it is probable that testimonials as to his good moral character, similar to that elicited in connection with his application for reinstatement, could have been obtained at any point in time prior to knowledge of his misconduct on the part of those attesting to his good character.

In a number of our prior cases, *e.g., Attorney Grievance*

*Comm'n v. Green,* 278 Md. 412, 415, 365 A. 2d 39 (1976); *Bar Ass'n of Balto. City v. Posner,* 275 Md. 250, 257, 339 A. 2d 657, *cert. denied,* 423 U. S. 1016 (1975); and *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 317, 329 A. 2d 1 (1974), *cert. denied,* 420 U. S. 974 (1975), we quoted from *In re Stump,* 272 Ky. 593, 114 S.W.2d 1094 (1938), concerning the petition for reinstatement of a disbarred attorney:

> The ultimate and decisive question is always whether the applicant is now of good moral character and is a fit and proper person to be reintrusted with the confidences and privileges of an attorney at law. This question has a broader significance than its purely personal aspect. From time immemorial lawyers have in a peculiar sense been regarded as officers of the court. It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He owes a definite responsibility to the public in the proper administration of justice. It is of utmost importance that the honor and integrity of the legal profession should be preserved and that the lives of its members be without reproach. The malpractice of one reflects dishonor not only upon his brethren, but upon the courts themselves, and creates among the people a distrust of the courts and the bar. [*Id.* at 598.]

Here Dippel made use of his legal training and knowledge to steal from certain estates. Without any apparent reason other than sheer greed, Dippel engaged in a calculated campaign of theft. He testified that he "was earning money — $40,000 to $50,000 a year from about 1950." Even in this day of inflation such earnings would be regarded as substantial. Translated into the equivalent of 1979 dollars, however, his earnings by his account must have been well over $80,000 per year. Thus, greed alone would seem to have been the only reason behind his crime, a point illustrated by his statement that it was easy to steal by these forgeries and other manipulations.

Raimondi was convicted of an attempt to bribe in

connection with the highly unusual situation in which the General Assembly of Maryland was obliged to elect a Governor to serve a little more than two years of the remaining term of the Governor previously elected by the people. Such conduct strikes at the very fundamentals of our government, and the more so when it is perpetrated by a member of the Bar sworn to support the Constitution and laws of this State. See Maryland Code (1957) Art. 10, § 10.

Balancing all of the above mentioned factors and particularly taking into consideration the conduct for which Messrs. Dippel and Raimondi were disbarred and the time which has elapsed since then, we are unwilling to once again constitute them officers of this Court, thereby placing them in a position where they may handle the affairs of others. Thus, their petitions for reinstatement will be denied.

> *It is so ordered; petitioners in each instance shall pay all costs, including all costs of transcripts, pursuant to Maryland Rule BV15 b, c.*