EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>    Pedro Colton Fontán | 2001 TSPR 91 |

Número del Caso: TS-3026


Fecha: 18/junio/2001


Oficina del Procurador General

                              Lcda. Edna E. Rodríguez Benítez
                              Procuradora General Auxiliar

                              Lcda. Yvonne Casanova Pelosi
                              Procuradora General Auxiliar


Procurador Especial de la Comisión:
                              Lcdo. Luis M. Negrón Portillo


Abogados de la Parte Querellada:
                              Lcdo. Angel Viera Martínez
                              Lcdo. Felipe Benicio Sánchez


Materia: Solicitud de Reinstalación


        Este documento constituye un documento oficial del Tribunal Supremo que está
    sujeto a los cambios y correcciones del proceso de compilación y publicación
    oficial de las decisiones del Tribunal. Su distribución electrónica se hace
    como un servicio público a la comunidad.

In re:

Pedro Colton Fontán

TS-3026

RESOLUCION

San Juan, Puerto Rico, a 18 de junio de 2001

Pedro Colton Fontán fue admitido al ejercicio de la abogacía, por este Tribunal, el 14 de diciembre de 1967. El 10 de octubre de 1986, el entonces Fiscal Especial Independiente, Lcdo. Alejandro Salgado Rivera, radicó ante este Tribunal una querella jurada contra Colton Fontán, en la cual, en síntesis y en lo pertinente, le imputó numerosos cargos por alegada conducta profesional impropia ––mientras éste se desempeñaba como Fiscal Especial General y Director de la División de Investigación Criminal del Departamento de Justicia de Puerto Rico–– durante la investigación relacionada con los desafortunados sucesos ocurridos en el Cerro Maravilla, jurisdicción del pueblo de Villalba, en los cuales murieron trágicamente los jóvenes Arnaldo Darío Rosado y Carlos Soto Arriví.

Contestada la querella por Colton Fontán, y habiendo éste negado las alegaciones fundamentales de la misma, el Tribunal designó al entonces Juez Superior, Lcdo. Abner Limardo, como Comisionado Especial. Luego de celebrar vistas al efecto, el Comisionado Especial Limardo formuló y le rindió al Tribunal su informe, con las correspondientes determinaciones de hechos. Mediante una extensa Opinión, de fecha 21 de febrero de 1991, este Tribunal dictó Sentencia, separando permanentemente

a Pedro Colton Fontán del ejercicio de la profesión de abogado.[1] Solicitada la reconsideración por Colton Fontán, el Tribunal la denegó por falta de jurisdicción, mediante Resolución a esos efectos del día 9 de abril de 1991, quedando éste efectivamente separado del ejercicio de la profesión de abogado desde esa fecha.

Así las cosas, Colton Fontán presentó el día 7 de junio de 1996, una petición mediante la cual solicitó de este tribunal que redujera la sanción impuesta, de separación permanente, a una de cinco (5) años, los cuales ya había cumplido.[2]

Mediante Resolución, de fecha 28 de junio de 1996, el Tribunal --"a los fines de evaluar su posible reinstalación al ejercicio de la abogacía"-- refirió la petición de Colton Fontán a la Comisión de Reputación de Aspirantes al Ejercicio de la Abogacía "para evaluación e informe"; a esos fines, se le concedió a la Comisión, en dicha fecha, "el término de sesenta (60) días para rendir el correspondiente informe".[3]

Luego de unos trámites procesales que resultan innecesarios reseñar,[4] la Comisión de Reputación celebró vistas durante los días 16 y 29 de noviembre de 1999. A dichas vistas comparecieron sobre veinte (20) testigos, entre ellos, abogados, jueces, religiosos y otras personas que conocen al peticionario Colton Fontán.

El entonces Procurador General de Puerto Rico, Lcdo. Gustavo A. Gelpí --que fue el que participó en la vista celebrada por la Comisión-- prontamente radicó, el día 2 de diciembre de 1999, su informe ante este Tribunal. En el mismo expresó, en síntesis, que a base de la prueba presentada resultaba incuestionable que Pedro Colton Fontán:

"(i) es considerado en la comunidad como un ser humano de gran integridad moral; (ii) vive arrepentido de la conducta que causó su separación de la profesión de abogado y no guarda rencor hacia el Tribunal Supremo ni habla despectivamente de nadie envuelto en su desaforo; (iii) es un excelente esposo y padre de familia; (iv) es una persona humilde quien incondicionalmente ayuda a los demás; (v) luego de su suspensión no ha ejercido la abogacía, pero gratuitamente ha rendido servicios paralegales de excelencia a varios abogados; (vi) a través de su creciente fe religiosa ha podido superar sus contratiempos y vivir su vida de forma positiva; (vii) sus serios problemas de salud no han sido obstáculo a que éste lleve una vida sana y productiva dentro de las limitaciones de su desaforo; (viii) se ha convertido en un excelente teólogo, estudiante por sí solo, y está terminando de escribir un libro sobre todos los personajes bíblicos del Viejo y Nuevo Testamento; y, (ix) de ser reinstalado a su antigua profesión, éste no constituye un riesgo ni para la profesión de la abogacía ni para la sociedad en general; al contrario sería un honor para sus compañeros tenerlo de vuelta en la profesión."

En fin, en opinión del entonces Procurador General de Puerto Rico --gozando Pedro Colton Fontán de excelente reputación en la comunidad en que convive; estando totalmente rehabilitado

---

[1] Surge de la referida Sentencia que el Juez Asociado señor Rebollo López no intervino y que la Juez Asociada señora Naveira de Rodón se inhibió al igual que el entonces Juez Asociado señor Andréu García.

[2] En la referida petición se solicitaba que se le requiriera al Procurador General de Puerto Rico que expresara su criterio respecto a la misma; dicho funcionario ya había recibido una encomienda de este Tribunal respecto a un planteamiento hecho por Angel Figueroa Vivas, otro de los abogados separados del ejercicio de la profesión en este caso.

Esta petición --de Pedro Colton Fontán-- fue suscrita, y endosada, por veintitrés (23) distinguidos miembros de la profesión legal, entre éstos, tres ex-presidentes del Colegio de Abogados de Puerto Rico, a saber: los Lcdos. Graciany Miranda Marchand, Carlos R. Noriega y Angel L. Tapia Flores.

[3] Surge de la referida Resolución que "el Juez Asociado señor Negrón García denegaría, sin ulterior trámite, la presente solicitud. El Juez Asociado señor Hernández Denton denegaría la solicitud en esta etapa. El Juez Presidente señor Andréu García y la Juez Asociada señora Naveira de Rodón inhibidos." (Enfasis suplido.)

[4] Entre éstos, merece que señalemos la autorización que le concedimos a la Comisión de Reputación para que contratara un "Procurador Especial" para que asistiera a la referida Comisión en el trámite del caso y la orden que emitiéramos instruyendo a todas las partes que notificaran al Procurador General de todos los escritos que radicaran ante la Comisión de Reputación.

desde el punto de vista moral; estando genuinamente arrepentido de la conducta que conllevó su caída profesional; habiéndose mantenido al día en la profesión legal mediante el estudio de la jurisprudencia-- éste es merecedor de ser readmitido al ejercicio de la profesión de la abogacía ya que la separación decretada en el año 1991 "ha logrado el propósito fundamental de rehabilitación".

La Comisión de Reputación radicó su informe el día 23 de marzo de 2001. El mismo no es favorable al peticionario Colton Fontán. Un análisis de dicho informe a nuestro entender demuestra que la Comisión basa, de manera principal, su no recomendación en la seriedad y gravedad no sólo de los sucesos acaecidos en el Cerro Maravilla sino que en la seriedad y gravedad de la conducta observada por el peticionario Colton Fontán en la investigación de los mismos.

La seriedad, y desgracia, de lo ocurrido en el Cerro Maravilla y la gravedad de la conducta observada por Colton Fontán es incuestionable. Tan serios y graves fueron sus actos que este Tribunal, en el 1991, entendió procedente separarlo de manera permanente del ejercicio de la abogacía. Ello no está en controversia.[5]

El asunto hoy ante la consideración del Tribunal es otro, a saber: si Pedro Colton Fontán hoy día es una persona apta para ejercer la profesión de abogado. La prueba a su favor, en este extremo, resulta ser abrumadora. Reiteradamente hemos resuelto que, en términos generales, "la persona que solicita ser reinstalada al ejercicio de la profesión de abogado tiene la obligación de demostrar no sólo que el término de la suspensión, o separación, de la profesión decretada ha sido uno suficiente, sino que debe demostrar que goza de buena reputación y que su integridad moral, al momento de la solicitud de reinstalación, le hacen merecedor de ser readmitido al ejercicio de la profesión de abogado." In re: Pacheco Nieves, 135 D.P.R. 95, 99 (1994); In re: Rivera Cintrón, 120 D.P.R. 706, 708 (1988); In re: Cardona Vázquez, 112 D.P.R. 686, 689 (1982).

Dichos criterios han sido satisfechos en el presente caso. Han transcurrido diez (10) años desde que Pedro Colton Fontán fue separado del ejercicio de la profesión. La prueba incontrovertida presentada ante la mencionada Comisión demuestra que éste goza de una excelente reputación en la comunidad en que convive; está seriamente arrepentido de la conducta antiética en que incurrió y por la cual fue disciplinado; está totalmente rehabilitado desde el punto de vista moral; y se ha mantenido al día, por el estudio de la jurisprudencia, en la profesión de abogado. En fin, la única prueba desfilada ante la Comisión demuestra que Colton Fontán está totalmente rehabilitado y capacitado para ejercer la abogacía.

Resulta importante enfatizar que la Comisión, en su informe, acepta la inexistencia de prueba contraria a la solicitud de readmisión de Colton Fontán. Su tesis central, repetimos, descansa de manera casi exclusiva en la gravedad y seriedad de la conducta observada por éste, cuestión que ya fue objeto de adjudicación en el proceso de desaforo. No estando en controversia el contenido, y carácter, de la prueba desfilada ante la Comisión, resulta totalmente innecesario ordenar una transcripción de los procedimientos en el presente caso.[6]

Llana y sencillamente, la determinación negativa de la Comisión de Reputación es una hecha en el vacío, esto es, la misma no está avalada por prueba alguna; su conclusión a esos efectos meramente es índice de la opinión, hasta cierto punto arbitraria, de dicho organismo. En fin, nos enfrentamos a una apreciación manifiestamente errónea, de la prueba incontrovertida desfilada, por parte de la referida Comisión, la cual no representa el balance más racional justiciero y jurídico de la misma, razón por la cual podemos descartar dicha conclusión. Méndez v. Morales, 142 D.P.R. 26, 36 (1996); Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357, 364 (1982); Abudo Servera v. A.T.P.R., 105 D.P.R. 728 (1977); Maryland Casualty v. Quick Const. Corp., 90 D.P.R. 329 (1964). De todas maneras, es a este Tribunal --y no a la mencionada Comisión-- al que compete pasar juicio, final y definitivo, sobre la admisión, o readmisión, de abogados al ejercicio de la profesión en esta jurisdicción. Véase: In re: Pacheco Nieves, 135 D.P.R. 95 (1994).

En atención a lo antes expuesto, realmente no tenemos otra alternativa o curso de acción que no sea decretar la reinstalación inmediata de Colton Fontán al ejercicio de la profesión de abogado. Nuestra jurisprudencia sobre la materia así lo requiere. Conviene

---

[5] Mediante escrito de fecha 30 de mayo de 2001, intitulado "Réplica del Procurador General al Informe de la Comisión de Reputación", el actual Procurador General de Puerto Rico, Lcdo. Roberto J. Sánchez Ramos, expresa su parecer de que Colton Fontán no debe ser reinstalado al ejercicio de la profesión de abogado, basado dicho criterio en la gravedad de los hechos que le fueron imputados a éste; asunto que, repetimos, no está en controversia.

[6] Es de notar que el actual Procurador General de Puerto Rico, Lcdo. Roberto Sánchez Ramos, en su reciente comparecencia —en la cual difiere de la recomendación de su predecesor— tampoco cuestiona el hecho de que toda la prueba desfilada ante la Comisión fue enteramente favorable a Colton Fontán.

recordar la sabia, imparcial y objetiva norma que, al respecto, este Tribunal estableció hace aproximadamente cuarenta (40) años en In re: Charneco, 72 D.P.R. 897, 898 (1951)[7], a los efectos de que: "Al solicitar su rehabilitación un abogado que ha sido desaforado, la médula de la cuestión no es si dicho abogado ha expiado su culpa ni si ha sido suficientemente castigado, sino más bien si en el momento de la solicitud él goza de tal reputación que justifique su readmisión a dicho ejercicio, es decir, si su integridad moral amerita su rehabilitación". (Enfasis suplido.)

La tesis --tomada convenientemente de otras jurisdicciones-- de que existen "ciertas situaciones en las cuales el tipo de ofensa cometida por el abogado, como cuestión de umbral, impide su readmisión" se desploma ante la innegable realidad de que este Tribunal consideró apropiado admitir al ejercicio de la profesión a una persona que había sido acusada, y convicta, del delito de Asesinato; conducta que resulta ser la más grave y deleznable conforme al vigente Código Penal de Puerto Rico[8]. Debe enfatizarse el hecho de que Colton Fontán nunca fue convicto de delito alguno en relación con los hechos por los cuales fue desaforado. Por otro lado, debe igualmente enfatizarse que este Tribunal, en fechas relativamente recientes, ha estimado apropiado reinstalar al ejercicio de la profesión, al entenderlos rehabilitados, a abogados que habían sido desaforados por haber sido convictos de delitos graves. Véase, entre otros: Resolución, de fecha 20 de abril de 2001, emitida en In re: Milton Rúa Cabrera, reinstalándolo al ejercicio de la abogacía[9]; Resolución, de fecha 6 de abril de 2001, emitida en In re: Roberto José Maldonado Rivera, reinstalando a éste al ejercicio de la profesión[10]; Resolución, de fecha 11 de junio de 1999, emitida en In re: Frank Dalmau Gómez, igualmente reinstalando a éste al ejercicio de la profesión de abogado.[11]

El historial, y la normativa, jurisprudencial antes reseñada nos impide, repetimos, darle un trato distinto a Pedro Colton Fontán; persona que no ha sido convicta de delito público alguno y que está, en estos momentos, completamente capacitada y rehabilitada para ejercer la profesión legal en nuestra jurisdicción. Denegarle dicha reinstalación constituiría darle a éste un trato discriminatorio por razones ajenas a la referida normativa jurisprudencial, curso de acción que nos negamos a seguir.

La Sección 7 de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico dispone:

"Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad".

En Amy v. Administrador del Deporte Hípico, 116 D.P.R. 414, 421 (1985), citando al delegado Hon. José Trías Monge, consignamos que "[l]a palabra 'vida' contiene una serie de derechos tales como el derecho a la educación, el derecho al trabajo y el derecho a un nivel adecuado de vida."

Continuar privando a un ser humano que ha demostrado total arrepentimiento y que está completamente rehabilitado, del ejercicio de su profesión, luego de diez (10) años de desaforo, sería condenarlo perennemente a un trabajo y a un nivel de vida por debajo de su capacidad.

No debemos olvidar, por otro lado, que el Artículo VI, Sección 19, de nuestra Constitución dispone que será política pública del Estado Libre Asociado … "reglamentar las instituciones penales para que sirvan sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social."

---

[7] Abogado que había sido desaforado permanentemente y que fue reinstalado al ejercicio de la profesión por este Tribunal.

[8] Véase: Resolución del 22 de mayo de 1992 admitiendo a Honorio Adorno Lorenzana al ejercicio de la profesión de abogado. En dicha ocasión, únicamente disintió de dicha actuación el ex-Juez, Hon. Antonio S. Negrón García.

[9] Surge de la Resolución emitida que la Juez Asociada señora Naveira de Rodón no intervino y que el Juez Asociado señor Hernández Denton se inhibió.

[10] Surge de la Resolución emitida en dicho caso que los Jueces Asociados señor Rebollo López, señora Naveira de Rodón y señor Corrada del Río no intervinieron.

[11] Surge de la Resolución emitida en dicho caso que el entonces Juez Asociado de este Tribunal, señor Negrón García, no intervino y que la Juez Asociada señora Naveira de Rodón disintió sin opinión escrita.

Si la política pública del Estado Libre Asociado de Puerto Rico  propende a la rehabilitación moral y social de los delincuentes, realmente no entendemos a las personas que pretenden negarle la oportunidad de ser reinstalado al ejercicio de la profesión a un abogado que --a pesar de haber incurrido en conducta violatoria de los Cánones de Etica Judicial, por la cual fue desaforado-- está en estos momentos totalmente arrepentido y rehabilitado, sobre todo cuando consideramos que esta persona nunca fue convicta de delito público alguno.

Sin olvidar la gravedad de los hechos que se le imputaron, y se estimaron probados, a Pedro Colton Fontán --lo cual ayuda a evitar que en el futuro otras personas incurran en conducta similar-- es momento de ponerle punto final al asunto, aceptando que existe en los seres humanos la capacidad de genuinamente arrepentirse y rehabilitarse.

La virtud de perdonar, ante el comprobado arrepentimiento y rehabilitación de la persona que faltó o falló en un momento determinado de su vida, es parte inherente y necesaria de nuestra existencia. Esa es una lección o enseñanza divina que todo ser humano debe acatar y seguir.[12]

En atención a todo lo antes expuesto, se decreta la <u>reinstalación inmediata</u> al ejercicio de la profesión de abogado de Pedro Colton Fontán.

<u>Publíquese</u>.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton emitió Voto Particular Disidente. El Juez Presidente señor Andréu García y la Juez Asociada señora Naveira de Rodón inhibidos. El Juez Asociado señor Fuster Berlingeri no intervino.


                                        Isabel Llompart Zeno
                                        Secretaria del Tribunal Supremo

---

[12] "Entonces se le acercó Pedro y le preguntó: Señor, ¿cuántas veces he de perdonar a mi hermano si peca contra mí? ¿Hasta siete veces? Dícele Jesús: No digo yo hasta siete veces, sino hasta setenta veces siete". Mateo 18:21.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Pedro Colton Fontán

TS-3026

Voto Particular Disidente emitido por el Juez Asociado Señor Hernández Denton

San Juan, Puerto Rico, a 18 de junio de 2001.

> *"Mancharon la imagen del Ministerio Fiscal y debilitaron la efectividad del importante rol que desempeña en el sistema de justicia criminal. . . A la violencia física ilegal de la Policía añadieron la violación ética."* In re Colton Fontán, 128 D.P.R. 1, 113 (1991).

Descontextualizada, por demás, es la Justicia que hoy imparte el Tribunal. Olvida que es nuestro deber velar por que las instituciones encargadas de la administración de la Justicia gocen de la más alta confianza pública e ignora nuestra obligación de garantizar que los miembros de la clase togada sean dignos representantes de los valores que sustentan la legitimidad y esencia misma del Poder Judicial.

Al permitir su readmisión al ejercicio de la abogacía, esta Curia relega a un segundo plano que Pedro Colton Fontán, mientras fungía como Director de Investigación Criminal del Departamento de Justicia, encabezó un concertado plan de hostigamiento e intimidación de testigos orientado a encubrir la verdad de lo ocurrido el 25 de julio de 1978 en el Cerro Maravilla. Omite también que, en tal esfuerzo, utilizó los recursos del Estado así como su posición y poder para proveer un manto de legitimidad y engañar al País ante lo que, a todas luces, eran asesinatos cometidos por agentes del Estado. En fin, al readmitirle el Tribunal no considera que Colton Fontán protagonizó la construcción de una verdad oficial específicamente dirigida a proyectar la legalidad de los actos de la policía e infligió un daño institucional, sin asomo de dudas, irreparable.

Fue por todo lo anterior que el 21 de febrero de 1991 le **separamos permanentemente** del ejercicio de la abogacía. In re Colton Fontán, 128 D.P.R. 1 (1991)[13]. En esa ocasión le sancionamos por ampararnos el más profundo convencimiento de que sus actos representaron una torpeza profesional y ética de singular magnitud y trascendencia. Así lo creemos todavía. A pesar de ello, la Mayoría de este Tribunal decide readmitirlo. Disentimos, pues, de su dictamen.

I

> *"[Marte] comunicó al Lcdo. Colton del acercamiento que le hiciera en Ponce un representante de la Unión laboral UTIER para entrevistarle sobre su conocimiento de los sucesos del Cerro Maravilla. El Lcdo. Colton le respondió indicándole que le informara quién era esa persona 'para ponerlo fuera de circulación'. A Marte esta afirmación le preocupó e infundió temor por su propia vida y la de sus familiares."*
> In re Colton Fontán, 128 D.P.R. 1, 54 (1991).

El 4 de junio de 1996 compareció ante nos Colton Fontán solicitando, en síntesis, que modifiquemos la sanción impuesta por este Tribunal en In re Colton Fontán, supra, para sustituirla por una suspensión de cinco (5) años, ya cumplidos. Manifestó no interesar relitigar los hechos que dieron base a su separación, y que deseaba "extirpar de su recuerdo y de su vida este episodio que **lo sorprendió sin esperarlo ni buscarlo**". Petición, 4 de junio de 1996, pág. 1 (énfasis suplido).

El 28 de junio de 1996, emitimos Resolución mediante la cual referimos la petición de Colton Fontán para la evaluación de la Comisión de Reputación para el Ejercicio de la Abogacía.[14] Luego que la Comisión de Reputación designara, y este Tribunal aprobara, un

---

[13] La Opinión del Tribunal, suscrita por el Juez Asociado señor Negrón García, contó con la conformidad del entonces Juez Presidente señor Victor M. Pons Núñez, del Juez Asociado señor Rafael Alonso Alonso y de este Juez que suscribe. El Juez Asociado señor Rebollo López no intervino. La Jueza Asociada señora Naveira de Rodón y el Juez Asociado señor Andréu García se inhibieron. In re Colton Fontán, supra.

[14] En esa ocasión, el Juez Asociado señor Negrón García hubiese denegado sin ulterior trámite la solicitud y nosotros la hubiésemos denegado en esa etapa. El Juez Presidente señor Andréu García y la Jueza Asociada señora Naviera de Rodón, inhibidos.

Procurador Especial para atender la presente solicitud,[15] se celebraron vistas en las que se recibieron los testimonios de los testigos de reputación presentados por el peticionario. El entonces Procurador General, el Lcdo. Gustavo A. Gelpí, compareció ante nos el 2 de diciembre de 1999 expresando no tener objeción alguna a la petición de readmisión de Colton Fontán.[16] Por otra parte, luego de recibir toda la prueba, la Comisión de Reputación emitió un Informe en el que "no recomend[ó] la readmisión solicitada".[17]

Inconforme con esta recomendación, compareció Colton Fontán replicando a dicho Informe y solicitando que ordenemos su readmisión. Posteriormente, compareció el Procurador General, el Lcdo. Roberto J. Sánchez Ramos, reconsiderando la recomendación emitida por su predecesor y secundando la posición de la Comisión de Reputación a los efectos de no favorecer la readmisión del peticionario.[18]

Sin embargo, el Tribunal mediante la Resolución de hoy ordena la readmisión del señor Colton Fontán tras determinar que éste "goza de una excelente reputación en la comunidad en que convive; está seriamente arrepentido de la conducta anti-ética en que incurrió y por la cual fue disciplinado; está totalmente rehabilitado desde el punto de vista moral; y se ha mantenido al día, por el estudio de la jurisprudencia, en la profesión de abogado." Resolución, pág 5.

Luego de evaluar detenidamente el expediente del caso, disentimos de nuestros compañeros Jueces. Por la importancia y trascendencia de este caso hemos decidido emitir esta Opinión. Así, nuestros hijos, nietos y demás generaciones futuras podrán juzgar nuestros actos luego de evaluarlos en su justa perspectiva.

II

*"El Lcdo. Colton insistió en su posición y amenazó en que lo metería a la cárcel por perjurio, exigiéndole que tenía que cambiar la declaración prestada en la prensa."* In re Colton Fontán, 128 D.P.R. 1, 35 (1991).

No hay en nuestra jurisdicción cuerpo reglamentario alguno que establezca de manera específica los parámetros y criterios sustantivos para la consideración de una solicitud de readmisión de un abogado separado de la profesión. El Reglamento de este Tribunal meramente dispone que la Comisión de Reputación para el Ejercicio de la Abogacía examinará "cualquier asunto relativo a la readmisión de un(a) abogado(a) a la profesión que le sea remitido por el Tribunal." Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap.

---

[15] Se designó al Lcdo. Luis Mariano Negrón Portillo. Véase, Resolución de 19 de diciembre de 1997.

[16] Informe y Recomendación del Procurador General, 2 de diciembre de 1999.

[17] Informe al Tribunal Supremo, 23 de marzo de 2001.

[18] Véase, Réplica del Procurador General al Informe de la Comisión de Reputación, 30 de mayo de 2001. En respuesta a este escrito del Procurador General, el peticionario compareció el 7 de junio de 2001 reiterando su solicitud de readmisión a base de la prueba desfilada ante la Comisión de Reputación. Véase, Dúplica del Peticionario.

XXI-A R.12(c). Por su parte, el Reglamento de dicha Comisión establece que la misma deberá "[i]nvestigar, evaluar y hacer las recomendaciones al Tribunal Supremo que estime pertinentes sobre la rehabilitación del solicitante o la solicitante". Regla 1(B)(2), Reglamento de la Comisión de Reputación para el Ejercicio de la Abogacía del 30 de junio de 1998.[19]

Ha sido, por tanto, a través del ejercicio de nuestro poder constitucional e inherente que, caso a caso, hemos plasmado los criterios para atender las diferentes solicitudes de readmisión de abogados. Así, mediante la amarga, pero a su vez necesaria y profiláctica, tarea de disciplinar a los abogados hemos dibujado los contornos normativos sobre la readmisión de aquéllos sancionados. Nunca, sin embargo, hemos tenido la oportunidad de expresar nuestro criterio ante escenarios disciplinarios como el presente. Lo hacemos, pues, en el desempeño de nuestro ministerio con la sincera esperanza de no tener que invocarlo nuevamente.

A

Reiteradamente hemos señalado que, en el análisis final, procederá la readmisión de un abogado si al momento de hacer su solicitud, éste goza de tal reputación que justifique su admisión al ejercicio de la profesión y no si ha sido suficientemente castigado o si ha expiado su culpa. Es decir, **si su integridad moral actual amerita su readmisión**. In re Pacheco Nieves, 135 D.P.R. 95 (1994); In re Rivera Cintrón, 120 D.P.R. 706 (1988); In re Cardona Vázquez, 112 D.P.R. 686 (1982); In re Cruz Disdier, 73 D.P.R. 346 (1952); In re Charneco, 72 D.P.R. 897 (1951); In re Figueroa Maestre, 38 D.P.R. 955 (1928). Bajo estos parámetros, hemos confiado sabiamente en la capacidad de reivindicación personal de todo abogado, mostrándonos siempre sensibles a las circunstancias particulares de cada caso y conscientes de que en juego se encuentran las aspiraciones vocacionales, profesionales y económicas de cada uno.

Entendemos, no obstante, que inherente a nuestra función disciplinaria hay una dimensión social que trasciende aspectos puramente personales y que en, ocasiones, debe mirarse con mayor cuidado.

Sabido es que el procedimiento disciplinario, y por ende el de readmisión, no responde a un propósito de carácter punitivo. In re Báez Torres, 108 D.P.R. 358, 361 (1979). Responde, más bien, a nuestro apremiante interés en proteger a la profesión legal, la integridad del sistema judicial y al público de abogados incompetentes e inescrupulosos. Al mismo tiempo, aspira a la rehabilitación del abogado y a disuadir a los miembros de la profesión legal

---

[19] El Reglamento de la Comisión de Reputación, en vigor desde el 1 de julio de 1998, contiene además varias disposiciones sobre los aspectos procesales de la readmisión. Véase, Regla 5, Reglamento de la Comisión de Reputación para el Ejercicio de la Abogacía del 30 de junio de 1998. Las disposiciones de este Reglamento no son aplicables al caso de autos por aprobarse éste en fecha posterior a la remisión del asunto a la Comisión. Regla 7(B), Id.

de incurrir en conducta anti-ética. Annotation, <u>Reinstatement of Attorney After Disbarment, Suspension, or Resignation</u>, 70 A.L.R.2d 268, sec. 3, pág. 276 (1960); Guillermo Figueroa Prieto, <u>Responsabilidad Profesional</u>, 65 Rev. Jur. U.P.R. 723, 754 (1996). **Responde también a nuestro interés por que los responsables de garantizar la justicia a nuestra ciudadanía inspiren y estimulen el más alto respeto y confianza en las instituciones judiciales del País**. Véase, <u>Cánones de Ética Judicial de Puerto Rico</u>, Canon I, 4 L.P.R.A. Ap. IV-A C. I; <u>Preámbulo del Código de Ética Profesional</u>, 4 L.P.R.A. Ap. IX ("es de primordial importancia instituir y mantener un orden jurídico íntegro y eficaz, que goce de la completa confianza y apoyo de la ciudadanía").

Por ello, al atender una petición de readmisión, este Tribunal debe considerar, no sólo el carácter moral del solicitante, i.e., el plano individual, sino también si con su readmisión se protege el interés público en la administración ordenada e imparcial de la justicia. Annotation, <u>supra</u>, págs. 274, 283. En este sentido, la evaluación de una solicitud de readmisión no debe limitarse a la aplicación mecánica de un criterio único de análisis, sino que debe ser un proceso dinámico y multidimensional que atienda, caso a caso, la totalidad de las circunstancias en armonía con los propósitos de nuestra función disciplinaria y reguladora en el ámbito profesional.

Veamos, pues, los criterios que, a tenor con los antedichos principios, múltiples jurisdicciones y autoridades han utilizado para atender situaciones como ésta.

B

De ordinario, ante una solicitud de readmisión un tribunal debe considerar, entre otras cosas, (1) **la naturaleza y gravedad de la conducta por la cual fue sancionado el abogado**; (2) su carácter y reputación previo a la imposición de sanciones; (3) sus cualidades mentales y morales al momento de solicitar ser readmitido, incluyendo su competencia profesional actual para practicar el derecho; (4) la conducta y reputación posterior a ser sancionado así como los pasos tomados para remediar las faltas; (5) el tiempo transcurrido entre la sanción y la solicitud de readmisión; (6) que el abogado no haya violentado los términos de la sanción mediante la práctica no autorizada de la abogacía; y (7) si el abogado reconoce la seriedad de la conducta. American Law Institute, Restatement of the Law Third, <u>The Law Governing Lawyers: Proposed Final Draft</u>, sec. 5, pág. 51 (1996); American Bar Association, <u>Model Rules for Lawyer Disciplinary Enforcement</u>, R. 25(E); Annotation, <u>Reinstatement of Attorney After Disbarment, Suspension, or Resignation</u>, 70 A.L.R.2d 268 (1960); 7A C.J.S. sec. 124, pág. 148 (1980); Anne Badgley, <u>Attorney Reinstatement Standards: A Proposal for Reform in Washington State</u>, 62 Wash. L. Rev. 723, 726-27 (1987). Véanse además, <u>In re Brown</u>, 617 A.2d 194 (D.C. 1992); <u>Matter of Pool</u>, 401 Mass. 460, 517 N.E.2d 444 (Mass. 1988); <u>In re Roundtree</u>, 503 A.2d 1215 (D.C. 1985); <u>State</u> v. <u>Russo</u>, 630 P.2d 711

---

El Reglamento anterior no disponía de parámetros procesales o sustantivos para las solicitudes de readmisión.

(Kan. 1981); Matter of Raimondi, 403 A.2d 1234 (Md. 1979); In re Hiss, 333 N.E.2d 429 (Mass. 1975); In re Barton, 329 A.2d 102 (Md. 1974); In re Bruener, 34 P.2d 437 (Wash. 1934).

La propia Resolución de este Tribunal utiliza este análisis multifactorial al decretar la readmisión de Colton Fontán. Evalúa, pues, el tiempo transcurrido desde su desaforo, su reputación, arrepentimiento, carácter moral y su competencia profesional actual. Sin embargo, no toma adecuadamente en consideración la gravedad y naturaleza de la conducta por la cual se separó al peticionario y despacha cándidamente este crucial asunto al expresar que

> [l]a seriedad, y desgracia, de lo ocurrido en el Cerro Maravilla y la gravedad de la conducta observada por Colton Fontán es incuestionable. Tan serios y graves fueron sus actos que este Tribunal, en el 1991, entendió procedente separarlo de manera permanente del ejercicio de la abogacía. Ello, repetimos, no está en controversia. Resolución, pág. 4 (énfasis en el original).

Aunque en este caso no se están relitigando los hechos que dieron base a la sanción del peticionario, sí podemos y debemos tomar en cuenta dicha conducta. **Especialmente en casos como el presente —que trata sobre gravísimas faltas profesionales— la consideración de este factor garantiza que miremos de forma integral la solicitud en cuestión, de manera que desempeñemos nuestra función disciplinaria a la luz de los valores sociales y de interés público que estamos llamados a proteger.**

Además, su consideración resulta inevitable toda vez que el concepto mismo de rehabilitación tiene como punto de referencia la conducta por la que fue sancionado el abogado, pues es con relación a ésta que se mide su carácter actual. Véase, Wolfram, Modern Legal Ethics, sec. 3.5.5, pág. 133 (West 1986) ("[t]he court must first examine the original offence and assess the extent to which the lawyer might now be able to resist similar temptations").

Ahora bien, en cuanto a la consideración específica de la naturaleza y seriedad de la conducta como factor, debemos señalar varias cuestiones principales.

En primer lugar, la evaluación de dicho factor tiene un impacto decisivo sobre la carga probatoria del peticionario. Como se ha dicho, de ordinario procederá la readmisión de un abogado si se determina que se ha rehabilitado, tras alcanzar un nivel de integridad moral adecuado. Su rehabilitación, no obstante, no se presume y le corresponde al peticionario demostrar mediante prueba clara y convincente que cumple con las condiciones necesarias para que este Tribunal le confiera la confianza que una vez ostentó. In re Cardona Vázquez, supra. Véase además American Bar Association, Standards for Imposing Lawyer Sanctions, Standard 2.2 (1986); American Law Institute, Restatement of the Law Third, The Law Governing Lawyers: Proposed Final Draft, loc. cit.

Sin embargo, cuando se trata de las más serias infracciones al ordenamiento deontológico profesional, como en este caso, la consideración de la gravedad y naturaleza de la ofensa alcanza una singular preeminencia y peso en el balance de factores. **De ahí que la carga probatoria del peticionario para demostrar su aptitud se vea incrementada en**

**proporción a la naturaleza y seriedad de la conducta por la que fue sancionado.** Véanse, In re Barton, supra, pág. 104 ("[w]ith regard to the nature and circumstances of a disbarred attorney's original misconduct, the more serious the original misconduct was, the heavier the burden to prove present fitness for readmission to the bar."); Matter of Robbins, 836 P.2d 965, pág. 966 (Ariz. 1992) ("[t]he more egregious the misconduct, the heavier the burden to prove his or her present fitness to practice law."); Matter of Raimondi, supra, pág. 1237 ("the graver the misconduct the graver the burden").

En segundo lugar, y en relación con la metodología de adjudicación específica que como norma general ha de emplearse en estos casos, tribunales en otras jurisdicciones han utilizado un balance de intereses para atender los múltiples factores pertinentes así como el ámbito teleológico de nuestra función disciplinaria.

En este balance se considera, de un lado, la seriedad de la conducta y el deber del Tribunal de velar por valores sociales fundamentales (i.e., (1) la integridad del sistema judicial; (2) la protección de la profesión y del público en general; y (3) la promoción del respeto y confianza en las instituciones jurídicas). Contra ello se evalúa el carácter moral del peticionario así como su rehabilitación y demás factores personales. Véanse, Matter of Raimondi, supra, pág. 1240; Matter of Pool, supra, pág. 447; State v. Russo, supra, pág 716. Así, se conjugan tanto los aspectos individuales como los colectivos de la readmisión y se le brinda el debido peso a estos últimos.

Sin embargo, en ocasiones la gravedad de la ofensa que motivó la sanción alcanza tal trascendencia e impacto sobre el interés público, que toda consideración sobre la rehabilitación del peticionario se torna totalmente impertinente. Es decir, cuando los actos que suscitaron la separación del abogado son cual epicentro de terremoto ético, de tal forma que su readmisión mancharía inevitable e irreparablemente la confianza pública en nuestras instituciones judiciales, el interés público aconseja no readmitirle sin más. En estos casos, el interés privado del peticionario debe ceder completamente ante el rol protector con el que está investido este Foro.

**Por ello, sencillamente hay ciertas situaciones en las cuales el tipo de ofensa cometida por el abogado, como cuestión de umbral, impide su readmisión.** State v. Russo, 630 P.2d 711, 715 (Kan., 1981) ("[t]he seriousness of the underlying offense which led to the prior discipline may, **as a threshold matter**, preclude reinstatement such that further inquiry as to rehabilitation of the petitioner is not warranted.", Id.) *Véanse además* Matter of Dunn, 707 P.2d 1076, 1078 (Kan., 1985); Réplica del Procurador General al Informe de la Comisión de Reputación, 30 de mayo de 2001, pág. 5.

Ahora bien, determinar cuáles violaciones éticas activan esta consideración especial, y bajo qué circunstancias es, en algunos casos (aunque no en éste), una línea difícil de trazar. Debe ser, en todo caso, una decisión basada en los hechos, contexto y motivos de cada instancia. Conforme lo anterior, figuras de fundamental trascendencia

para el desarrollo de nuestro ordenamiento profesional, así como diversos tribunales de otras jurisdicciones, han tenido la ocasión de adelantar algún parámetro orientador.

Así, la Comisión de 1970 para evaluar los procedimientos disciplinarios de la American Bar Association, presidida por el Ex Juez Asociado del Tribunal Supremo de Estados Unidos, Tom Clark, expresó que la solicitud de readmisión de un abogado que incurra en, por ejemplo, **soborno a un jurado** merece un tajante repudio:

> [T]he nature of the offense and the circumstances surrounding it should be considered in evaluating an application for reinstatement. Thus, the more serious the offense, the nearer it strikes at the heart of the administration of justice, the greater the affirmative proof that should be required of the applicant for readmission. **For example, it is difficult to conceive of circumstances that would justify the reinstatement of an attorney who has been disbarred for bribing a juror.** American Bar Association: Special Committee on Evaluation of Disciplinary Enforcement, <u>Problems and Recommendations in Disciplinary Enforcement</u>, pág. 155 (Borrador Final, Junio 1970) (énfasis suplido).

Así también, varios tribunales estatales han llevado como punta de lanza su interés en la protección del sistema de administración de justicia y en la preservación de la confianza que la ciudadanía deposita en él, para negarse a readmitir a abogados desaforados cuando, por la naturaleza de sus actos, su readmisión afectará profundamente la dignidad del foro. A tales efectos, por ejemplo, el Tribunal Supremo de Massachussets al denegar la petición de reinstalación de un Juez sancionado por participar en un esquema de **corrupción** decidió no considerar el carácter moral del peticionario y expresó:

> [I]n deciding a case of this kind considerations of public welfare are wholly dominant. The question is not whether the respondent has been 'punished' enough. To make that the test would be to give undue weight to his private interest whereas the true test must always be the public welfare. Where any clash of interest occurs, whatever is good for the individual must give way to whatever tends to the security and advancement of public justice. . . .
>
> **Even were we to assume that there is convincing evidence of moral qualification, competency, and learning such as to give substantial assurance that Gordon would not himself commit any act that would reflect adversely on the public interest, this added issue of the "effect of reinstatement" raises the question whether the bar or the public would regard reinstatement as an indication that the original offense was not viewed with sufficient gravity.** <u>In the Matter of Richard K. Gordon</u>, 429 N.E.2d 1150, 1154-55 (Mass., 1982) (énfasis suplido).

En otro caso, en que el peticionario había sido sancionado por reclamar créditos contributivos ilegalmente y por indebidamente favorecer económicamente como Juez a determinados doctores en el pago de honorarios en casos de daños y perjuicios, el Tribunal Supremo del antedicho estado resolvió, además, que:

> **Notwithstanding the findings of present good character,** the factor of paramount significance is that the petitioner throughout most, if not all, of his years of misconduct was a judge of a court of record of the Commonwealth. . . .
>
> If [the petitioner] should be readmitted to the office of attorney and held out as worthy of trust as an officer of the court, **public confidence in the courts would be lessened and general respect for membership in the bar lowered. Such a decision would not be in the interest of the public welfare but would be a disservice to it.** The maintenance of the integrity of the courts and of the bar compels one result, that the petition for readmission be denied. <u>Petition of Centracchio</u>, 187 N.E.2d 383, 347-48 (Mass., 1963) (énfasis suplido).

Asimismo, el Tribunal Supremo de West Virginia siguió idéntico curso en un caso en el que un abogado desaforado por haber **sobornado a un jurado** solicitaba ser readmitido. Dicho foro entendió que bajo las circunstancias del caso y, debido a la seriedad de la ofensa con respecto a la imagen y confianza pública en el sistema de justicia, su readmisión debía ser denegada independientemente de su nivel de rehabilitación. Razonó dicho Tribunal que:

> **Because of the extremely serious nature of applicant's original offense of bribing a juror when coupled with the separate conviction of conspiring to bribe public officials, we cannot help but conclude that his reinstatement would have a justifiable and substantial adverse effect on the public confidence in the administration of justice.** The nature of these crimes directed as they are to the core of the legal system and the integrity of governmental institutions demonstrates a profound lack of moral character on the part of the applicant.
>
> We have held in *Smith* that **the seriousness of the underlying offense leading to disbarment may, as a threshold matter, preclude reinstatement such that further inquiry as to rehabilitation is not warranted. The offenses involved in this case manifestly meet this test and for this reason applicant's petition for reinstatement is denied.** In re Brown, 272 S.E.2d 567, 574 (W.Va., 1980) (énfasis suplido).

En síntesis, según los parámetros dictados por la experiencia en jurisdicciones análogas y por otras autoridades, hay ciertos casos, como el soborno y otros delitos graves, que afectan aspectos tan centrales al sistema de justicia que ameritan la denegación de la solicitud de readmisión sin que sea necesario considerar la rehabilitación del peticionario. Véase además, e.g., State v. Russo, supra (conspiración para violar las leyes estatales de prostitución y soborno de funcionario público). **Para saber si estamos ante una de estas situaciones, debemos fijarnos en el posible impacto negativo que la readmisión del peticionario tendrá sobre la integridad del sistema judicial y la confianza pública en éste, según la gravedad y alcance de su conducta anterior.**

Toda vez que los actos por los que separamos a Colton Fontán son, en nuestra historia reciente, los más flagrantemente violatorios de la dignidad y honra de la profesión y de las instituciones de administración de la justicia, su readmisión debe ser denegada. Veamos.

III

> "*[E]l Lcdo. Colton instruyó específicamente a Ana Celia Cintrón Lema para que en su certificación de la transcripción de sus notas taquigráficas de la misma no lo incluyese a él como que la estaba tomando o fuera prestada ante él. . . . 'Toñita, cuando vayas a transcribir no pongas mi nombre ahí.'*" In re Colton Fontán, 128 D.P.R. 1, 55-56 (1991)

No es necesario relatar con detalle todos los hechos por los cuales el peticionario fue sancionado.[20] Debemos, sin embargo, referirnos al resumen de los mismos según expresamos en aquella ocasión:

> En síntesis, contra *Colton Fontán* quedaron probados los cargos relativos a su intervención y presión indebida el 31 de julio de 1978 con el testigo Ortiz Molina; que el 3 de agosto le sugirió al testigo Marte Ruiz que, contrario a

---

[20] Para una exposición completa del contexto y hechos que dieron lugar a la imposición de sanciones disciplinarias contra el peticionario, véase, In re Colton Fontán, 128 D.P.R. 1 (1991).

lo que éste le informaba, declarara que nadie había disparado desde el interior de las facilidades de la WRIK-TV y que sólo había escuchado una ráfaga de disparos; y que creó sobre ese mismo testigo un grave temor al pedirle que le identificara la persona que le preguntaba sobre los hechos con el propósito de "sacarlo fuera de circulación".

Además, dio instrucciones específicas a la taquígrafa Cintrón Lema para que en la certificación de la declaración jurada de Marte Ruiz no lo incluyera como el Fiscal ante quien se había prestado. De ese modo ordenó alterar intencionalmente un importante documento correspondiente al proceso investigativo.

. . .

Además, *Colton Fontán y Figueroa Vivas*, en su desempeño como fiscales independientes y actuando combinadamente, el 17 de agosto de 1978 le ofrecieron empleo al testigo Quiñones Quiñones, y el 26 de julio de 1978, sin previo aviso, se personaron a su residencia en Ponce y lo amenazaron con formularle acusaciones por varios delitos si no alteraba su declaración.

Quedó probado que los dos efectuaron una investigación plagada de múltiples omisiones y deficiencias respecto a: (1) la evidencia real y objetiva en la escena (impactos en el portón, Volkswagen y vehículo público de Ortiz Molina, casquillos de armas largas, pantalón lleno de sangre y sucio a nivel de las rodillas con arena y tierra, máscara, botas, ropa interior y zapatos); (2) los análisis periciales de esos objetos; (3) la evidencia de agresión policíaca que surgía de los cadáveres de las víctimas Darío Rosado y Soto Arriví (fotografías y autopsia del primero), y (4) en torno a los testimonios perpetuados durante la investigación (origen del "alto" descrito por González Malavé el 31 de julio de 1978).

**Finalmente, publicaron los resultados de su investigación en un informe y lo dieron a la luz pública en una conferencia de prensa celebrada el 29 de agosto de 1978. En el mismo perpetuaron el primer engaño público respecto a lo ocurrido en el Cerro Maravilla. En esa conferencia, Colton Fontán fue enfático en que la "investigación revela que no hubo masacre, golpizas ni agresiones".** In re Colton Fontán, supra, pág. 107-08 (énfasis suplido).

Sin dudas, el peticionario carga con un sombrío historial. No trató su conducta sobre actos sin daño ni víctima cometidos en privado o dentro de un ámbito de fácil reparación. Tampoco fueron omisiones razonables de un funcionario público sin experiencia. Su conducta anti-ética fue totalmente incompatible con la médula y corazón de nuestro sistema ético-profesional pues faltó a la verdad, no por omisión, sino por la constante instigación al perjurio. Además, con arrogancia y afanosamente traicionó su deber primordial de procurar que se haga justicia. Canon 5, Código de Ética Profesional, 4 L.P.R.A. Ap. IX C.5.

Fueron actos, además, realizados desde la confianza inherente al cargo que nuestro ordenamiento le confiere a un funcionario en su posición y en violación directa a los deberes especiales que, como fiscal, ostentaba. Véase, In re Nilka Marrero García, 2001 TSPR 55 (Op. Conformidad Hernández Denton) ("un abogado que se desempeñe como fiscal, o en una función investigativa análoga, está sometido a estándares éticos más estrictos que los que obligan a la profesión en general, pues no sólo viene obligado a cumplir con los cánones que rigen la profesión de la abogacía, sino también de demostrar imparcialidad en su función inquisitiva".)

Pero más allá del impedimento que representó en la búsqueda de la verdad y de los actos específicos que quebraron la decencia del Ministerio Fiscal, el peticionario obró de una forma especialmente grave para la estabilidad de nuestro sistema democrático.

Actuando a nombre del Estado, suplió la legitimidad de la cual carecía la torcida investigación que dirigía. De esta forma, ayudó a crear una realidad pública para promover la impunidad de los autores de un infame crimen y, por un corto periodo, convirtió al Estado en cómplice de una inconmensurable inmoralidad ética y política. **En fin, Pedro Colton Fontán intentó vender los ojos del País ante una verdad que le era obvia y creó un simulacro de legalidad en menoscabo del espíritu imparcial y justiciero que deben proyectar las instituciones de justicia criminal del Estado.** De haber dependido la ciudadanía puertorriqueña en la versión oficial vertida por este funcionario en el informe del Departamento de Justicia del 29 de agosto de 1978, la verdad sobre el asesinato de los jóvenes Arnaldo Darío Rosado y Carlos Soto Arriví jamás se hubiese sabido. Fue, en cambio, gracias al diligente esfuerzo de la vigorosa prensa que nuestro sistema democrático ostenta, que lo realmente ocurrido en el Cerro Maravilla logró ser investigado minuciosamente por el Senado de Puerto Rico a partir del año 1981. Véase, Manuel Suárez, Requiem on Cerro Maravilla: The Police Murders in Puerto Rico and the U.S. Government Coverup (Waterfront Press, 1987).

En un contexto como éste, los intereses atinentes a nuestra obligación constitucional para con el sistema de justicia puertorriqueño se colocan en su más alto escalafón y alcanzan su mayor peso en la balanza. La conducta que condujo a su desaforo fue de tal magnitud que su reinstalación, con total certeza, mancillará la imagen de integridad y pulcritud que debe reflejar la profesión legal en Puerto Rico. Además, socavará la confianza del Pueblo en esta honorable profesión y en sus instituciones de administrar justicia, **incluyendo este Tribunal.**

Colton en su solicitud nos señala que durante el tiempo que ha estado separado de la profesión "ha logrado alcanzar cierta tranquilidad de espíritu" y que de ser reinstalado "habrá de ejercer la abogacía con rectitud, honestidad y gran sentido de responsabilidad." Petición, pág. 3. Su solicitud de readmisión fue acompañada de veintitrés (23) cartas de endoso de miembros de la profesión legal y de su comunidad. Además, a la vista ante la Comisión de Reputación comparecieron varias personas que testificaron sobre su aptitud y solvencia moral.

Debe señalarse, sin embargo, que en su gran mayoría las cartas de endoso se limitan a indicar de manera general e imprecisa su aptitud moral. Además, casi todas señalan como razón principal para su respaldo que Colton Fontán ha expiado su pena y que ha sufrido bastante desde que le sancionamos. Algunas de ellas hacen referencia a su buena conducta durante el tiempo de la sanción, pero ninguna nos brinda las consideraciones específicas en que basan sus conclusiones.[21]

---

[21] Inclusive, en una de las cartas uno de los endosantes expresa: "No conozco los detalles de las causas que dieron lugar a su desaforo pero no tengo otra alternativa que presumir que fueron causas adecuadas". Petición, Anejo 7. En otra, se dice que **"[m]uy posiblemente** el tiempo que se le ha mantenido

Recalcamos que nuestra función disciplinaria no es punitiva. Por tanto, nuestro criterio no debe ser movido por meros sentimientos de simpatía al peticionario ni la repetida contención de que ha pagado su pena. Annotation, _supra_, págs. 308-10, 313. Además, expresiones vagas y ambiguas sobre su rehabilitación, aunque con superlativos, son insuficientes para readmitirle, especialmente en casos de la gravedad presente. En cuanto a la insuficiencia de testimonios por razón de esta generalidad, nos hacemos eco de lo expresado por el American Law Institute sobre el particular: "Testimonials from lawyers are relevant only if they demonstrate thorough familiarity both with the conduct causing suspension and with specific steps the lawyer has taken to achieve rehabilitation." American Law Institute, Restatement of the Law Third, _The Law Governing Lawyers: Proposed Final Draft_, _supra_, pág. 48.

De otra parte, en la vista expresaron opiniones favorables a su readmisión la Lcda. Sarah Torres Peralta; el Padre Armando Álvarez, sacerdote católico y párroco de la Academia Perpetuo Socorro; el Lcdo. Luis A. Rodríguez, ministro evangélico de la Iglesia Defensores de la Fe; y su propia esposa, la Sra. Mirtelina Vergé de Colton. Estas personas –todas allegadas al peticionario– subrayaron, como evidencia de su rehabilitación, el gran fervor religioso alcanzado por Colton Fontán en años recientes. Se nos señala, además, que el peticionario se encuentra en la preparación de un libro de teología, sobre personajes bíblicos.

> No empece lo anterior, la Comisión de Reputación nos señala que Colton Fontán **no declaró en detalle ni convincentemente sobre su proceso de introspección que le llevó a pensar que es acreedor a la reinstalación por entender que está rehabilitado de su conducta que lo llevó al desaforo**. De hecho, el peticionario no demostró el verdadero arrepentimiento por su participación protagónica en los hechos que lo llevaron al desaforo y por haber inducido a tantas otras personas a actuar en forma ilegal.
> Tampoco declaró sobre cómo subsanar el impacto de su conducta. Fue parco en ese extremo y sin embargo dio gran énfasis a su libro sobre los personajes bíblicos y a su fe religiosa. _Informe al Tribunal Supremo_, 23 de marzo de 2001, pág. 7 (énfasis suplido).

En síntesis, tras considerar, entre otros factores, la gravedad de los hechos que dieron lugar a su separación y la prueba de su rehabilitación, la Comisión decidió no recomendar la readmisión solicitada. Surge de su Informe que el peticionario no descargó satisfactoriamente su deber de mover el ánimo de los miembros de la Comisión hasta convencerles de su rehabilitación.

No puede olvidarse que el foro que aprecia el comportamiento y manera en que los testigos se expresan en la silla testifical, se encuentra en una posición sumamente privilegiada para evaluar su credibilidad. Por esta razón, es norma firmemente establecida que el criterio de estos organismos deliberativos merece un alto grado de deferencia por parte de los foros apelativos. _Pueblo v. Chévere Hereida_, 139 D.P.R. 1 (1995); _Ortiz v._

---

desaforado al Sr. Colton le ha permitido una profunda reflexión..." _Id_. Anejo 9 (énfasis suplido).

Cruz Pabón, 103 D.P.R. 939 (1975). Dichos organismos son un valioso instrumento en el que confiamos el trámite y consideración de casos como éste. Sus recomendaciones, de ordinario, deben ser respetadas pues están fundamentadas en la prueba efectivamente presenciada y desfilada ante sí. In re Belén Trujillo, 128 D.P.R. 949, 958 (1991).

Realmente, y con el mayor de los respetos hacia nuestros compañeros Jueces, no entendemos cómo en este caso la Mayoría ha variado una regla tan sabia y juiciosa como ésta al ignorar por completo el informe y recomendaciones de la Comisión de Reputación. Este proceder nos resulta aún más sorprendente al considerar que este Tribunal **no cuenta**, tan siquiera, ni con una transcripción de los testimonios vertidos en las vistas ante la Comisión ni con una exposición narrativa de los mismos.

Surge del expediente de este caso, que el propio peticionario ha reconocido la falta de capacidad de este Tribunal para hacer una determinación en cuanto a su rehabilitación, toda vez que mediante Moción Solicitando Vista Oral y Transcripción de la Vista Oral Celebrada ante la Honorable Comisión de Reputación del 20 de abril de 2001, solicitó que ordenemos "la transcripción de la prueba oral que tuvo ante sí la Honorable Comisión, **dando lugar con esto a que el tribunal esté en igual condición que la Honorable Comisión para aquilatar y ponderar la prueba**"(énfasis suplido). A la fecha este Tribunal no ha actuado sobre dicha petición ni se ha transcrito dicha prueba.

Sin el beneficio de estos documentos realmente no encontramos qué criterios se utilizaron para concluir que la apreciación de la Comisión es "manifiestamente errónea" y "arbitraria". Resolución, pág. 5.

En cambio, la Mayoría de este Tribunal confía única y exclusivamente en una comparecencia escrita del anterior Procurador General, el Lcdo. Gustavo A. Gelpí, y se basa en dicho escrito para determinar que la prueba a favor del peticionario en cuanto a su rehabilitación resulta ser incuestionable y abrumadora. Véase, Resolución, págs. 3 y 4.

No olvidemos que la Comisión había nombrado con la aprobación expresa de este Tribunal un Procurador Especial –el Lcdo. Luis Mariano Negrón Portillo, actual Decano de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico– quien fue realmente la persona que tuvo a su cargo la investigación y los interrogatorios de todos los testigos. Véase, Resolución de 19 de diciembre de 1997.

Cabe señalar, además, que en todos y cada uno de los casos citados por la Resolución del Tribunal, en que recientemente este Foro ha readmitido a abogados sancionados tras haber cometido delitos graves, hemos contado con un informe de la Comisión de Reputación **favorable** a la readmisión de los peticionarios. Véase, <u>In re Milton Rúa Cabrer</u>, res. el 20 de abril de 2001, 2001 TSPR 56 (Informe al Tribunal Supremo del 23 de febrero de 2001); <u>In re Roberto José Maldonado Rivera</u>, res. el 6 de abril de 2001, 2001 TSPR 51 (Informe al Tribunal Supremo del 27 de febrero de 2001); <u>In re Frank Ángel Dalmau Gómez</u>, res. el 11 de junio de 1999, 99 TSPR 90 (Informe al Tribunal Supremo del 19 de marzo de 1999). Véase además, <u>In re Honorio Adorno Lorenzana</u>, Resolución del 22 de mayo de 1992. En este último caso, inclusive, este Tribunal se había negado a admitir al peticionario en dos ocasiones previas, en vista de las anteriores recomendaciones negativas de la Comisión. Véase, Resolución del 13 de octubre de 1983 y Resolución del 16 de octubre de 1986. No fue hasta que la Comisión de Reputación pudo certificar su buena reputación, que esta Curia estuvo en posición de acceder a la admisión del peticionario. Véase, Certificación del 19 de febrero de 1992.

De otro lado, esos casos también se distinguen del presente pues, aunque dichos abogados incurrieron en faltas muy graves, ninguno de ellos manchó de forma tan trascendental e impactante la confianza pública en nuestras instituciones. Por eso, en las referidas instancias disciplinarias la rehabilitación individual de cada peticionario fue suficiente para su readmisión o admisión. En el presente caso como se ha dicho, por la naturaleza de los actos del peticionario, el interés público alcanza una consideración de suma relevancia. Por ende, no es suficiente considerar aquí el sólo criterio de su rehabilitación como sí lo era para los peticionarios de los casos citados en la Resolución.

Aunque comprendemos los problemas que le ha causado el desaforo al peticionario y no dudamos de sus creencias religiosas, no podemos refrendar la decisión mayoritaria de reinstalarle aun en esta etapa de su vida. Tampoco cuestionamos la información vertida en la vista por los testigos de reputación en cuanto a su idoneidad como padre de familia, ni dudamos de la reputación ganada con su trabajo antes de los acontecimientos que provocaron su separación. Más bien nos preocupa que, al readmitirle, abdiquemos nuestra tarea fundamental de velar por el honor y dignidad de esta profesión así como por la integridad de nuestras instituciones. No podemos olvidar que los lamentables sucesos del Cerro Maravilla y su posterior encubrimiento son acontecimientos aún frescos en la memoria colectiva de nuestra ciudadanía, por lo que la readmisión de Colton Fontán representaría un menosprecio a este penetrante recuerdo y una certificación por este Foro de que el daño institucional que infligió ya ha sido superado.

Sin lugar a dudas la confianza pública en nuestras instituciones sufrió enormemente a raíz de los notorios actos del peticionario. Aún más, entendemos que la ciudadanía puertorriqueña confía hoy menos en sus instituciones públicas que lo que hubiese confiado a no ser por la conducta de Colton Fontán mientras fue fiscal. Además, estamos convencidos

que dicha confianza recibirá el más rudo golpe con su reinstalación al ejercicio de la abogacía.

Por ello, en el balance de intereses, y considerada la naturaleza e impacto de los actos por los que fue sancionado el peticionario, entendemos que la determinación que correctamente debió haber emitido esta Curia era la de denegar la readmisión solicitada. En nuestro deber como garantes de la integridad de esta profesión, nos oponemos impetuosamente a su readmisión.

IV

*"Sus conductas atentaron contra principios deontológicos básicos. No sólo merecen nuestro repudio y censura, sino también la imposición de las más severas sanciones disciplinarias."* In re Colton Fontán, 128 D.P.R. 1, 107 (1991)

Finalmente, enfatizamos que luego de más de una década de haber incurrido en las más serias violaciones a nuestro ordenamiento profesional, a Colton Fontán **le impusimos la sanción disciplinaria más severa que podemos impartir**. Esta consideración, de por sí, debe ser determinante en contra de su readmisión.

En aquella ocasión, los Jueces que formábamos la Mayoría de este Tribunal decidimos atemperar las sanciones impuestas en proporción a la conducta incurrida por cada uno de los abogados querellados. De esta forma, y en aras de particularizar justicieramente el ejercicio de nuestra función disciplinaria, unánimemente decretamos la **suspensión provisional** de los abogados querellados Juan E. Brunet Justiniano y de Aurelio Miró Carrión por tres (3) y cinco (5) años, respectivamente.[22] Además, **suspendimos de forma indefinida** al querellado Osvaldo Villanueva Díaz.[23] Sin embargo, y a la luz de la gravedad de los cargos probados, decretamos específicamente la **separación permanente** de Pedro Colton Fontán y de Ángel Figueroa Vivas. Es decir, inequívocamente distinguimos aquellos infractores cuya sanción tendría un límite temporal, de aquellos abogados cuya separación de la abogacía sería una constante invariable.

Como vivimos esa experiencia de primera mano, podemos decir con total certeza, autoridad moral y tranquilidad de espíritu, que el mandato institucional de este Tribunal en el caso de Pedro Colton Fontán fue con la proyección de separarlo permanentemente. No obstante, los Jueces que hoy constituyen la Mayoría, y que por distintas razones no formaron

---

[22] Luego de haber transcurrido el término por el que fueron suspendidos de la profesión, el 4 de marzo de 1994 fue reinstalado Juan E. Brunet Justiniano, 135 D.P.R. 259 (1994), y el 8 de marzo de 1996 reinstalamos a Aurelio Miró Carrión, 140 D.P.R. 224 (1996).

[23] El 7 de marzo de 2000, Osvaldo Villanueva Díaz compareció ante nos solicitando ser readmitido al ejercicio de la abogacía. El 24 de marzo de 2000, remitimos la consideración del asunto a la Comisión de Reputación. Véase, Resolución de 24 de marzo de 2000 (el Juez Asociado señor Rebollo López le "reinstalaría sin ulterior trámite". El Juez Presidente señor Andréu García y la Jueza Asociada señora Naviera de Rodón, inhibidos). A la fecha, la Comisión de Reputación no nos ha sometido un informe sobre el particular.

parte de aquel proceso deliberativo, deciden revocar nuestro claro e indiscutible dictamen de separarlo permanentemente de la abogacía.

En In re Querellas Sobre Conducta Profesional de Abogados, 104 D.P.R. 623 (1976), rechazamos la práctica seguida hasta ese momento de calificar toda querella presentada contra abogados como un procedimiento de "desaforo" y en cambio decidimos titularlas como de "conducta profesional". Acordamos entonces precisar y afinar nuestra nomenclatura disciplinaria para ajustarla a las circunstancias de cada caso y decidimos reservar nuestras más severas sanciones para cuando fuese realmente necesario. A tales efectos, resolvimos que "[d]esaforar implica privar a un abogado del ejercicio de su profesión; suspenderlo e impedirle actuar como tal. **Es la máxima sanción que este Tribunal puede imponer a un abogado por incurrir en conducta inmoral o impropia en el ejercicio de la abogacía.** Hay faltas, sin embargo, que no ameritan el desaforo, y en que una suspensión temporera, o una amonestación, son suficiente sanción." Id., pág. 624 (énfasis suplido).

Debe recordarse que "[e]n la órbita de nuestra jurisdicción original disciplinaria constantemente nos vemos obligados a adjudicar la conducta de miembros de la clase togada reñida con los Cánones de Ética Profesional. **La gama de posibilidades es tan grande como la variante escala valorativa individual.**" In re Laborde Freyre, res. el 12 de julio de 1999, 99 TSPR 124 (Op. de Conformidad del Juez Asociado señor Negrón García a la cual se une el Juez Asociado señor Hernández Denton) (énfasis suplido). De igual forma, las posibles sanciones comprenden desde la separación permanente hasta la amonestación o censura, adjetivadas o no.

En cuanto a la separación de la profesión, cabe aclarar que en muy raras ocasiones hemos utilizado el calificativo "permanente" al decretar la separación de un abogado. Más aún, de las quince (15) ocasiones que hemos encontrado en que este Foro ha decidido impartir la sanción de separación de forma específicamente **permanente**, en solamente una, sin incluir el presente caso, hemos reinstalado al peticionario.[24]

---

[24] En los siguientes casos separamos de manera permanente del ejercicio de la abogacía a los abogados querellados: In re Sandra Rivera, 139 D.P.R. 310 (1995); In re García Quintero, 138 D.P.R. 669 (1995); In re Néstor Hernández Pérez, 138 D.P.R. 791 (1995); In re John Medina Lugo, 136 D.P.R. 120 (1994); In re José E. Bonilla Martínez, 132 D.P.R. 1038 (1993); In re Pedro Colton Fontán, 128 D.P.R. 1 (1991); In re Santiago González, 121 D.P.R. 580 (1988); In re Serrallés, 119 D.P.R. 494 (1987); In re Añeses, 117 D.P.R. 134 (1986); In re Fournier Grau, 114 D.P.R. 255 (1983); In re Arreche Holdun, 114 D.P.R. 680 (1983); In re Cortéz Ostolaza, 103 D.P.R. 72 (1974); In re Ayuso Ramírez, 102 D.P.R. 65 (1974); In re Segarra, 102 D.P.R. 590 (1974).
Sólo en In re Máximo Rivera, 137 D.P.R. 464 (1994), readmitimos a un abogado separado permanentemente. En ese caso, el abogado fue separado por hechos totalmente distinguibles de los que dieron lugar a la separación permanente de Colton. En síntesis en ese caso, el Procurador General formuló querella contra el Lcdo. Rivera (1) por cobrar dinero por servicios profesionales que nunca realizó; (2) por cobrar dinero para atender la reconsideración de una sentencia en un caso criminal y expresarle al cliente que dicho dinero se utilizaría para ofrecérselo al Juez del caso; y (3) por haberse presentado una acusación criminal en su contra por tentativa de

Con todo lo anterior en mente, y con la cautela y delicadeza que amerita la imposición de esta sanción, fue que este Tribunal el 21 de febrero de 1991 separó permanentemente a Pedro Colton Fontán del ejercicio de la abogacía.

Ciertamente, el cambio en la posición del Tribunal que hoy se asume es preocupante. El proceder que hoy observa la Mayoría demuestra que es decididamente necesario que este Tribunal Supremo reglamente el alcance de nuestras sanciones y esquema disciplinario en general. Reconocemos que nunca nos hemos negado a considerar una solicitud de readmisión por el carácter permanente de la sanción impuesta. Sin embargo, el empleo de una terminología tan exacta como la que utilizamos al sancionar a Colton Fontán y en el contexto disciplinario en que se hizo, debe como mínimo reflejar nuestra intención de que es preferible dejar inamovible dicha sanción. De lo contrario, estaríamos equiparándola a la separación (sin calificativo) o a la suspensión indefinida, sanciones que han de ser impuestas ante graves infracciones de las normas profesionales, pero no ante los más tristes menoscabos de la confianza que nuestra sociedad le brinda a cada abogado.

Por otra parte, no podemos olvidar las normas de hermenéutica que cotidianamente aplicamos a la interpretación estatutaria y que, con igual fuerza, debemos utilizar con respecto a los dictámenes previos de este Foro. Así, de la misma forma que "[l]as palabras de la ley deben ser generalmente entendidas en su más corriente y usual significación", atendiendo al uso general y popular de las voces, así también debe ser asumido el texto de nuestro vocablo jurisprudencial. Véase, art. 15 del Código Civil, 31 L.P.R.A. sec. 15 (1993). La literalidad de la palabra "permanente" es inequívocamente patente, por lo que no debe ser interpretada de otra manera.[25]

Nos preocupa, además, que al relajar nuestro criterio previo, este Tribunal arroje dudas sobre la seriedad con la que asume su función disciplinaria. Sin embargo, nos preocupa

---

asesinato, en que se le imputaba haber instigado a su padre a que disparara contra un tercero. En cuanto al primero de los cargos, el abogado devolvió el dinero a su cliente. En cuanto al segundo, igualmente el querellado devolvió las cantidades recibidas, además, el Juez que presidió el caso criminal para el que fue contratado testificó que el abogado nunca le había hecho proposición alguna de soborno. Con relación al tercer cargo, el padre del querellado hizo alegación de culpabilidad y los cargos contra el abogado fueron archivados a petición de los propios perjudicados. 114 D.P.R. 390 (1983). Evidentemente, el alcance, naturaleza y circunstancias de las actuaciones por las que separamos permanentemente al referido abogado, se diferencian abismalmente del presente caso. Allí, todas las faltas fueron resarcidas y no tuvieron la gravedad y turbidez moral presentes en los actos de Colton Fontán. La reinstalación de ese abogado, aunque separado permanentemente, no tuvo el impacto sobre la confianza en nuestras instituciones que tendrá la Resolución de hoy.

[25] Según el Diccionario de la Lengua Española, de la Real Academia Española, permanente significa "que permanece". Diccionario de la Lengua Española, pág. 1119 (XXI Ed., 1992). "Permanencia" a su vez equivale a "[d]uración firme, constancia, perseverancia, estabilidad, inmutabilidad." Id. Por otra parte, según el Diccionario de Uso del Español, el adjetivo permanente "se aplica a lo que permanece: a lo que dura mucho o no se altera". María Moliner, Diccionario de Uso del Español, Vol. 2, pág. 710 (1994).

de forma aún más alarmante que, con la flexibilización de tan rigurosa sanción, se **menoscabe el alcance disuasivo de nuestras determinaciones disciplinarias**. Después de hoy no existe en Puerto Rico violación ética tan seria, por grave que fuere, que amerite una separación permanente. El mensaje que la determinación de hoy envía a la clase togada y a la ciudadanía es inquietante, pues si alguna vez existió una violación a la confianza pública que justifique la separación verdaderamente permanente de la abogacía, fue ésta.

V

En conclusión, la naturaleza, alcance y trascendencia pública de los actos por los cuales Pedro Colton Fontán fue separado permanentemente del ejercicio de la abogacía, impiden su readmisión. Su comportamiento puso en juego la vitalidad misma de nuestro sistema democrático. Echó por la borda, además, la confianza que el pueblo de Puerto Rico pone en su gobierno y en sus líderes para de manera inexcusable prolongar y agrandar un engaño de proporciones verdaderamente trágicas. Ocultó la médula de la verdad sobre los lamentables sucesos del 25 de julio de 1978 en el Cerro Maravilla y, de esa forma, vedó de manera incuestionablemente anti-ética la transparencia que debe imperar en el manejo de la justicia puertorriqueña. Recalcamos que la verdad sobre estos acontecimientos salió a relucir a pesar de, y no gracias a, las gestiones oficiales del ex-fiscal Colton Fontán. De no haber sido por el insistente esfuerzo de la prensa y su ejemplar labor investigativa, con toda probabilidad el Senado de Puerto Rico jamás hubiese investigado detalladamente estos sucesos, y lo acontecido en el Cerro Maravilla todavía permanecería oculto.

En fin, las violaciones éticas de Pedro Colton Fontán no fueron sino los más altos agravios que un abogado puede cometer, pues arremetió contra las instituciones y los valores mismos que le dan posibilidad y sentido a la profesión de la abogacía. Nos oponemos, pues, a su readmisión y disentimos del dictamen que hoy emite este Tribunal Supremo.

VI

Por todos los anteriores fundamentos, ante las circunstancias particulares de este caso y visto el Informe de la Comisión de Reputación para el Ejercicio de la Abogacía así como la comparecencia del Procurador General, denegaríamos la readmisión solicitada. Por ende, disentimos respetuosa pero enérgicamente de la Resolución de este Tribunal que readmite al ejercicio de la profesión de abogado al ex-fiscal Pedro Colton Fontán.

Federico Hernández Denton
Juez Asociado